| 82 | 351 |
| 85 | 30 |
| 82 | 351 |
| 142 | 318 |
| 142 | 319 |
| 82 | 351 |
| 145 | 448 |

[No. 11983.   In Bank. — January 2, 1890.]

## ELLEN M. COLTON, Appellant, *v.* LELAND STANFORD et al., Respondents.

Trust — Business Associates — Control of Corporations — Fiduciary Relation. — A business relation between several persons associated together for the purpose of organizing, controlling, and operating railroad and other corporations, and who repose great confidence in each other in respect to the business, if it does not constitute a partnership, is nevertheless a fiduciary relation between the associates, subject to the ordinary rules governing trust relations.

Id. — Contract of Trustee with Beneficiary — Presumption — Burden of Proof — Reliance upon Professional Advice — Rescission — Proof of Fraud. — In all trust relations, confidence is presumed; and if advantage has come to the trustee in dealing with the beneficiary, the burden is on the trustee to show that confidence has not been abused. But this presumption may be overcome by proof that no confidence was placed in the trustee, and that the beneficiary acted exclusively upon the advice of disinterested and competent professional advisers; and in such case, the transaction is not voidable at the election of the beneficiary, but it will devolve upon the latter, if he would set it aside, to show either actual or constructive fraud. Such fraud may be shown in some instances by presumptions.

Id. — Settlement with Representative of Deceased Associate — Waiver of Trust Relation — Compromise — Rescission for Fraud — Concealment and Misrepresentation — Investigation — Means of Knowl-

EDGE. — Conceding, without deciding, that the trust relation between business associates continues after the death of one of them, so as to impose an active obligation upon the survivors as trustees of his estate to disclose fully and correctly the condition of the business, upon a settlement thereof with his personal representative, yet, if it appears that absolutely no confidence was reposed in them by the personal representative, but that the latter acted exclusively upon the advice of several disinterested experts and professional friends specially selected to investigate and advise in the premises, and who had full access to all sources of information, there is a complete waiver of the trust relation, and of the obligation of the trustees, as such, to make an absolutely correct disclosure of all the facts, provided they acted in good faith, without intentional fraud. If it further appears that the trustees in good faith disclosed to the representative of their deceased associate every fact within their knowledge, a compromise effected by mutual concession of claims between the parties will not be rescinded upon the ground that the trustees did not disclose all facts of which they might have acquired knowledge by a more diligent and skillful search; nor upon the ground of inaccuracies and misrepresentations in the accounts rendered by them, if the existence of inaccuracies in their statement was known to plaintiff before the compromise, and the representations were discarded as unworthy of belief, and an independent investigation made into the sources of information, which were fully open, and it appears that every fact which has since been discovered could have been discovered before the execution of the agreement.

ID. — PRESUMPTION FROM INDEPENDENT INVESTIGATION. — The presumption follows from an independent investigation by the professional advisers of the beneficiary into the sources of information, that everything material was discovered, and this presumption is fortified by proof of memoranda kept by such advisers, showing unmistakable care, and a painstaking and minute consideration of the subject.

CONTRACT — EFFECT OF MISREPRESENTATION — INDEPENDENT ACTION OF OPPOSITE PARTY. — As a general rule, a party to a contract who makes a false representation without belief or without information is chargeable with a knowledge of its falsity, and is held as responsible as if he had such knowledge, where the other party has acted upon the representation, relying upon it as correct; but this rule is not applicable if the representation is not acted upon as correct, but the plaintiff has discarded it as unworthy of belief, and made an independent investigation with the aid of professional advisers.

ID. — RESCISSION OF CONTRACT — MISTAKEN REPRESENTATION NOT DETERMINING CONSENT — CODE RULE — FINDING. — There is a conflict of decisions upon the question as to whether a contract can be rescinded for an unintentionally false representation by a party to the contract which was the result of an innocent mistake, and made without due circumspection, if it appears that it was not the sole or controlling inducement to the contract, but was one of the inducements only, and a motive of action. But the rule in this state is settled by sections 1566, 1567, 1568, and 1689 of the Civil Code, the effect of which is to limit the remedy of rescission

to cases where the consent would not have been given had the alleged cause of rescission not existed. A misrepresentation, in order to avoid a contract, though it need not be the sole cause of the contract, must be of such nature, weight, and force that the court can say, "Without it the contract would not have been made"; and if the court properly finds it as a fact, from the evidence, that the contract would have been executed by the plaintiff had the truth been known, and the defendant, upon being made aware of the facts, had still insisted upon the same contract, there is no basis for a rescission.

ID. — UNIMPORTANT MISREPRESENTATION — EFFECT OF EXPENDITURES ENHANCING VALUE.— A mistaken representation of the defendant, not going to the main inducement to plaintiff in entering into the contract, but relating to a matter of comparatively small importance, will not justify a rescission of the contract by the plaintiff after large expenditures have been made by the defendant, on the faith of the agreement, which have materially enhanced the value of the property in litigation.

ID. — COMPROMISE AGREEMENT — REPRESENTATION AS TO VALUE— RATING OF RAILROAD BONDS — EQUITABLE ESTOPPEL. — When a compromise agreement is effected between plaintiff and defendants, in which railroad bonds involved in the compromise are represented to plaintiff to be worth only sixty cents on the dollar, and are so rated in the settlement, the fact that a few days after the compromise they are used by defendants to pay the indebtedness of one railroad corporation to another at ninety cents on the dollar does not constitute a fraud upon the plaintiff, or an equitable estoppel, so as to prevent the defendants from proving the truth of their representation, it appearing that the defendants practically dealt with themselves in the subsequent transaction, and rated the bonds at what they supposed they would become worth in the future, the transaction being merely a temporary mode of settling up a corporate obligation, and the plaintiff not being in any way bound by the transaction. Equitable estoppels must be mutual.

ID. — UNCONSIONABLE ADVANTAGE — CONSIDERATION OF CIRCUMSTANCES.— In determining whether unconscionable advantage of plaintiff has been taken by the defendants in the negotiation of a compromise between them, the question must be determined, not in the light of subsequent events, but upon the circumstances existing at the time of the negotiation and execution of the contract; and if it appears in view of those circumstances that no advantage was taken, and that the contract was fair, just, and equal, it will not be set aside.

ID. — DELAY IN SEEKING RESCISSION — CHANGE IN VALUE. — When a settlement and compromise of business relations has been effected between plaintiff and defendants under adverse circumstances, in view of which it was the desire of defendants that plaintiff should continue to prosecute the business at their mutual risk, which plaintiff was unwilling to do, the failure of plaintiff to seek a rescission of the compromise for two years, or to seek to become informed as to the facts upon which rescission is sought until the property involved in the business had under fortuitous circumstances greatly enhanced in value, is an important circumstance to be considered by the court.

LXXXII. CAL.—23

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*G. Frank Smith, Stanly, Stoney & Hayes,* and *E. W. McKinstry,* for Appellant.

The findings show a case for rescission under sections 1565, 1566, 1572, 1573, and 1575 of the Civil Code. Plaintiff is entitled to rescind the contract on account of the incorrect and imperfect statements of assets and accounts submitted by defendant in the negotiations for a settlement after their promise to furnish a perfect statement, and for their misrepresentation of fact as to the ownership of the Rocky Mountain Coal and Iron Company's stock. (*Rawlins* v. *Wickham,* 3 De Gex & J. 310; *Higgins* v. *Samuels,* 2 Johns. & H. 466; *Carpmeal* v. *Powis,* 10 Beav. 43; *Henderson* v. *Lacon,* L. R. 5 Eq. Cas. 250; *Ross* v. *Estates Investment Co.,* L. R. 3 Eq. Cas. 137; Kerr on Fraud and Mistake, 68, 87, 92, 94, 97, 98; 2 Pomeroy's Eq. Jur., sec. 901; *Lockwood* v. *Foster,* 4 Scam. 573; *Hart* v. *Swaine,* L. R. 7 Ch. Div. 42; *Redgrave* v. *Hurd,* 45 L. T., N. S., 485; *Reynell* v. *Sprye,* 1 De Gex, M. & G. 708, 709; *Doggett* v. *Emerson,* 3 Story, 700; *Baford* v. *Caldwell,* 3 Mo. 336; *Smith* v. *Babcock,* 2 Wood. & M. 246; *Haygarth* v. *Wearing,* L. R. 12 Eq. Cas. 328; *Grim* v. *Byrd,* 32 Gratt. 300; *Fisher* v. *Mellen,* 103 Mass. 503; *McClellan* v. *Scott,* 24 Wis. 85.) It is not necessary that the false representation should have been the motive in the sense of the only motive, or the only inducement to the party who has acted to his prejudice so to act. It is all-sufficient if it is a material inducement to his act. (*Peek* v. *Derry,* L. R. 37 Ch. Div. 574.) That part of the twentieth finding, viz., " that said representation, however, was not made with any actual fraudulent intent, but through inadvertence and lack of due circumspection, and that said contract would have been executed by the plain-

tiff had she known the truth in regard to said stock, if the defendants, upon being made aware of the facts, had still insisted upon it," is an immaterial finding. (Pollock's Principles of Contracts, *499; *In re Bank of Hindustan etc.,* L. R. 5 Ch. App. 100; Kerr on Fraud and Mistake, 75; *Traill* v *Baring,* 4 De Gex, J. & S. 330; *Cabot* v. *Christie,* 42 Vt. 127; 1 Am. Rep. 313; *Mathews* v. *Bliss,* 22 Pick. 53; *James* v. *Hodsden,* 47 Vt. 137; *Payne's Case,* L. R. 9 Eq. 225; *Rawlins* v. *Wickham,* 3 De Gex & J. 310; *Reynell* v. *Sprye,* 1 De Gex, M. & G. 708; *Pritt* v. *Clay,* 6 Beav. 503.) The contract was an entire contract,—" a lumping settlement,"—with no particular value placed upon anything surrendered or given by either party. It was, in part at least, produced by defendants' false representations. In such case the rule is thoroughly established that the whole contract will be set aside. (*Rawlins* v. *Wickham,* 3 De Gex & J. 310; *Reynell* v. *Sprye,* 1 De Gex, M. & G. 708; *Doggett* v. *Emerson,* 3 Story, 733; *Traill* v. *Baring,* 4 De Gex, J. & S. 330; *Payne's Case,* L. R. 9 Eq. 225; *Russell* v. *Winne,* 37 N. Y. 596; 97 Am. Dec. 755; *Niver* v. *Best,* 10 Barb. 369; *Goodrich* v. *Downs,* 6 Hill, 440; *Dana* v. *Lull,* 17 Vt. 397; *Valentine* v. *Stewart,* 15 Cal. 404; *Norris* v. *Harris,* 15 Cal. 245; *Erie R'y Co.* v. *U. L. & E. Co.,* 35 N. J. L. 246.) The business associates were partners, and occupied a trust relation toward each other and toward the plaintiff. (Civ. Code, secs. 2219, 2228–2237, 2395, 2410, 2411; *New Simbrew Phosphate Co.* v. *Erlanger,* L. R. 5 Ch. Div. 75; *Getty* v. *Devlin,* 54 N. Y. 412; *Simons* v. *Vulcan Oil Co.,* 61 Pa. St. 220; 100 Am. Dec. 628, *Shorb* v. *Beaudry,* 56 Cal. 446; *Cornell* v. *Corbin,* 64 Cal. 200; *Chater* v. *S. F. Sugar Co.,* 19 Cal. 246, 247; *Davis I. W. Iron Co.* v. *Davis W. Iron Co.,* 20 Fed. Rep. 700, 701; *Lintner* v. *Milliken,* 47 Ill. 181; *Nelson* v. *Hayner,* 66 Ill. 490; *Featherstonhaugh* v. *Fenwick,* 17 Ves. 309; *Crawshay* v. *Collins,* 15 Ves. 226; *Renfrow* v. *Pearce,* 68 Ill. 126; Parsons on Partnership, 458, 459; *Phillips* v. *Anderson,* 2 Brown Ch. 272; *Burden* v. *Burden,*

1 Ves. & B. 170; *Flagg* v. *Mann*, 2 Sum. 521–545; *Short* v. *Stevenson*, 63 Pa. St. 96; *Maddeford* v. *Austwick*, 1 Sim. 89; *Blisset* v. *Daniel*, 10 Hare, 488; *Bently* v. *Craven*, 18 Beav. 75.) Associated stockholders cannot manipulate the company's business to the injury of the company or of other stockholders, and are subject to the same rules of law as apply to trustees. (*Meeker* v. *Winthrop Iron Co.*, 17 Fed. Rep. 48; *Ervin* v. *Oregon R'y & Navigation Co.*, 27 Fed. Rep. 625.) The law of fiduciary relation is applicable to all persons who, being employed in or concerned with the affairs of another, have acquired a knowledge of his property. (*Davoue* v. *Fanning*, 2 Johns. Ch. 252; Lewin on Trusts, 463; *Ex parte Lacey*, 6 Ves. 625; *Hatch* v. *Hatch*, 9 Ves. 292; *Ex parte James*, 8 Ves. 345; *Michoud* v. *Girod*, 4 How. 566; *Fox* v. *MacKreth*, 1 Lead. Cas. Eq. 240, 267; *Moore* v. *Moore*, 4 Sand. Ch. 37; *Boyd* v. *Hawkins*, 2 Dev. Eq. 195–329; 2 Pomeroy's Eq. Jur., sec. 958; *Tate* v. *Williamson*, L. R. 2 Ch. App. 55; *Rhodes* v. *Bate*, L. R. 1 Ch. App. 256; *Young* v. *Hughes*, 32 N. J. Eq. 384; *Butler* v. *Haskel*, 4 Desaus. Ch. 702; *Poillon* v. *Martin*, 1 Sand. Ch. 569.) The trust relation existed between the parties by reason and as a consequence of the existence of the relation of pledgor and pledgee. (*Dillon* v. *Burbacker*, 52 Pa. St. 505; *Sitgraves* v. *Bank*, 49 Pa. St. 364; Edwards on Bailments, 213–228; Story on Bailments, sec. 324; *Boynton* v. *Payrow*, 67 Me. 587; *Stokes* v. *Frazier*, 72 Ill. 432; *Brown* v. *Runals*, 14 Wis. 696; *Bennett* v. *Austin*, 81 N. Y. 321; *Wright* v. *Ross*, 36 Cal. 441; *Ponce* v. *Mc-Elvy*, 47 Cal. 159.) The facts found show a legal fraud; and its existence is a question of law upon the facts. (*Colman* v. *Burr*, 93 N. Y. 17; 45 Am. Rep. 160; *Pettibone* v. *Stevens*, 15 Conn. 26; 38 Am. Dec. 57; *Beers* v. *Botsford*, 13 Conn. 154; *St. John* v. *Camp*, 17 Conn. 232; *Story* v. *N. & W. R. R. Co.*, 24 Conn. 113; *Lavett* v. *Sage*, 29 Conn. 589; *Redfield* v. *Buck*, 35 Conn. 338; 95 Am. Dec. 241.) There can be no compromise between a trustee and beneficiary as to the trust property. (Civ.

Code, sec. 2230.) At all events, it is essential to the validity
of such compomise that there should be equal knowledge
or means of knowledge; and it must be rescinded, if in-
duced by superior knowledge, or upon mutual mistake,
or by any influence or pressure, or if the compromise
arrangement is unreasonable. (*Perkins* v. *Gay,* 3 Serg.
& R. 331, 2 Pomeroy's Eq. Jur., sec. 850, p. 316; Kerr
on Fraud and Mistake, 124, 433, 434; *Stapilton* v.
*Stapilton,* 2 Lead. Cas. Eq., 4th ed., p. 1722, and
American notes; *Gibbons* v. *Caunt,* 4 Ves. 848; *Cook* v.
*Greves,* 30 Beav. 382; *Gordon* v. *Gordon,* 3 Swanst. 400
–475; *Groves* v. *Perkins,* 6 Sim. 577; *Broderick* v. *Brod-
erick,* 1 P Wms. 239; *Pusey* v. *Desbourne,* 3 P. Wms.
321; *McCarthy* v. *De Caix,* 2 Russ. & M. 623; *Smith* v.
*Pincombe,* 3 Macn. & G. 658; *Greenwood* v. *Greenwood,*
2 De Gex, J. & S. 37; *Sturge* v. *Sturge,* 12 Beav. 244;
*Pritt* v. *Clay,* 6 Beav. 503; *Wheeler* v. *Smith,* 9 How. 82;
*Stewart* v. *Ahrenfeldt,* 4 Denio, 190; *Baker* v. *Spencer,* 47
N. Y. 565; *Brooke* v. *Lord Mostyn,* 2 De Gex, J. & S. 373
–425; *Barlow* v. *O. Ins. Co.,* 4 Met. 270; *Converse* v.
*Blumrick,* 14 Mich. 112; 90 Am. Dec. 230; Addison on
Contracts, 130, 131; *Maddeford* v. *Austwick,* 1 Sim.
93; *Mackellar* v. *Wallace,* 36 Eug. L. & Eq. 64; *Gilbert* v.
*Endean,* L. R. 9 Ch. Div. 259.)

*Garber & Bishop,* for Respondents.

The allegations of matters of evidence in the complaint
cannot be considered in deciding the question of a trust
relation, and the case must be decided as if allegations
concerning trust relationship had been omitted. (*Robins*
v. *Hope,* 57 Cal. 499; *Cowee* v. *Cornell,* 75 N. Y. 92; 31
Am. Rep. 212; *Hunter* v. *Atkins,* 3 Mylne & K. 113; *Ca-
sey* v. *Casey,* 14 Ill. 113; *Korn* v. *Beckers,* 40 N. J. Eq.
410; *Falk* v. *Turner,* 101 Mass. 495; *Johnson* v. *Fesemeyer,*
3 De Gex & J. 13.) All questions concerning values
and adequacy of consideration are irrelevant. (1 Story's
Eq. Jur., secs. 245, 246; 2 Pomeroy's Eq. Jur., secs. 926–

948; Wald's Pollock on Contracts, 576; *Austin* v. *Chambers*, 6 Clark & F 1; *Cowee* v. *Cornell*, 75 N. Y. 92; 31 Am. Rep. 212; *McLure* v. *Ripley*, 2 Macn. & G. 280; *Kirkwood* v. *Thompson*, 2 De Gex, J. & S. 619; *Eyre* v. *Potter*, 15 How. 61; *Mayo* v. *Carrington*, 19 Gratt. 106; *Davidson* v. *Little*, 22 Pa. St. 251; 60 Am. Dec. 81; 1 Wharton on Contracts, 163–166, 517–519.) Inaccuracies in the exhibits are immaterial, because the parties were not settling on the basis of accuracy, and on the whole the errors were against the defendants. It was only the total result which would be material. (Parsons on Partnership, 513, note *e; Bispham* v. *Price*, 15 How., and cases cited.) There was no such acting upon the alleged representations of defendants as the law and the code call for as prerequisites of rescission. (Civ. Code, sec. 1568; *Hough* v. *Richardson*, 3 Story, 691; *Veasey* v. *Doton*, 3 Allen, 380; *Bowman* v. *Carithers*, 40 Ind. 90; 2 Pomeroy's Eq. Jur., sec. 888; *Marsh* v. *Falker*, 40 N. Y. 566; *Long* v *Warren*, 68 N. Y. 430; *Smith* v. *Chadwick*, L. R. 20 Ch. Div. 44; *Jennings* v. *Broughton*, 5 De Gex, M. & G. 129; *Van Trott* v. *Wiese*, 36 Wis. 439; 2 Pomeroy's Eq. Jur., sec. 893, note; sec. 895, note; 1 Sugden on Property, 399; *Cleland* v. *Fish*, 43 Ill. 285; *Spencer* v. *Topham*, 22 Beav. 580; *Wilde* v. *Gibson*, 1 H. L. Cas. 605; *Coil* v. *Pittsburgh*, 40 Pa. St. 445; *Page* v. *Bent*, 2 Met. 374; *Franklin* v. *Vaughan*, 92 U. S. 516; *Aberaman* v. *Wickens*, L. R. 5 Eq. 505; *Smith* v. *Richards*, 13 Pet. 38; *Tallman* v *Green*, 3 Sand. 441; *Beale* v. *Seiveley*, 8 Leigh, 677; Bigelow on Fraud, 65; *Bristol* v. *Braidwood*, 28 Mich. 194.) The party complaining must have been injured. (Bispham's Eq., 2d ed., p. 214, sec. 216, and cases cited; *Hough* v. *Richardson*, 3 Story, 690.) There must be moral fraud, — fraud causing the contract, — not necessarily a fraud which is the sole cause of the contract, but a fraud without which the contract never would have been made. (*Smith* v. *Kay*, 7 H. L. Cas. 775; *Atlantic* v. *James*, 94 U. S. 207; *Walker* v. *Hough*, 59 Ill. 375; *Eyre* v. *Potter*, 15 How. 42; *Coles* v.

*Trecothick,* 9 Ves. 234; *Farnham* v. *Brooks,* 9 Pick. 231;
*Motley* v. *Motley,* 45 Ala. 558; *Percival* v. *Harger,* 40 Iowa,
289; *Matthews* v. *Bliss,* 22 Pick. 53; *S. M. I. Co.* v.
*Anderson,* 51 Miss. 833; 2 Pomeroy's Eq Jur., secs. 890,
897; *Hubbard* v. *Briggs,* 31 N. Y. 532.) The representa-
tion must be so material that its falsity renders it uncon-
scientious to enforce the agreement. (*In re Bannister,*
L. R. 12 Ch. Div. 147; 2 Pomeroy's Eq. Jur., secs. 889,
898, 899; Wald's Pollock on Contracts, 525–529; *Bowman*
v. *Carithers,* 40 Ind. 90; *Griswold* v. *Sabin,* 51 N. H. 167; 12
Am. Rep. 76; *Bainbridge* v. *Moss,* 3 Jur., N. S., 59.) It
must clearly appear that but for such misrepresentation
the compromise would not have been effected. (*Bigelow* v.
*Leabo,* 8 Or. 147; *Marsh* v. *Cook,* 32 N. J. Eq. 266, 267; *Hall*
v. *Johnson,* 41 Mich. 289; *Light* v. *Light,* 21 Pa. St. 41.)
The testimony shows that the misrepresentation com-
plained of did have and could have had no possible in-
fluence upon the mind or conduct of Mrs. Colton, or any
of her advisers. (*Jennings* v. *Broughton,* 5 De Gex, M. &
G. 135; *Clute* v. *Frasier,* 58 Iowa, 272; *Courtright* v. *Burnes,*
2 McCrary, 537; Lead. Cas. Eq. 1732, 1733; *Turner* v.
*Otis,* 1 Pac. L. Rep. 19; *Stettheimer* v. *Killip,* 75 N. Y. 282;
*Farnam* v. *Brooks,* 9 Pick. 212; *Knight* v. *Marjoribanks,* 11
Beav. 324; *Motley* v. *Motley,* 45 Ala. 558; *Geddes's Appeal,*
80 Pa. St. 460; *Van Trott* v. *Wiese,* 36 Wis. 439; *Bybee* v.
*Tharp,* 4 B. Mon. 324; *Atlantic Delaine Co.* v. *James,* 94
U. S. 212; *Walker* v. *Hough,* 59 Ill. 379; *Slaughter* v. *Ger-
son,* 13 Wall. 380; 3 Lead. Cas. Eq. 411; *Bierer's Appeal,*
92 Pa. St. 268; *Sexton* v. *Sexton,* 9 Gratt. 216, 217; *Naylor*
v. *Winch,* 1 Sim. & St. 555; *Mayhew* v. *Phœnix,* 23 Mich.
116; *Hall* v. *Johnson,* 41 Mich. 289.) There is no incon-
sistency between the finding that plaintiff acted in ac-
cordance with the representation, and the finding that
she was not induced by it. (*Phipps* v. *Buckman,* 30
Pa. St. 402; Cooley on Torts, 496–502.) The discovery
of new or additional evidence in support of adverse
claims which have been compromised does not warrant

a rescission. (*Gates* v. *Shutts,* 7 Mich. 134.) *A fortiori* will the court refuse to interfere where there is no new discovery, or for a discovery of that which might have been ascertained before settling. (*Courtright* v. *Burnes,* 2 McCrary, 541; *Steadwell* v. *Morris,* 61 Ga. 102; *Mayhew* v. *Phœnix,* 23 Mich. 106; *Bowman* v. *Carithers,* 40 Ind. 90; *Van Trott* v. *Wiese,* 36 Wis. 439.) The relations growing out of the ownership of stock and the control of the corporations by the defendants are not fiduciary in the sense of casting any *onus* or justifying rescission on any other terms or grounds than as between strangers. (*Carpenter* v. *Danforth,* 52 Barb. 581; *Deaderck* v. *Wilson,* 8 Baxt. 108; *Lefever* v. *Lefever,* 30 N. Y. 33; *Grant* v. *Attrill,* 11 Fed. Rep. 469; *Board etc.* v. *Reynolds,* 44 Ind. 509.) The *onus* of proving "sufficient consideration," spoken of in the code, does not mean adequacy, nor even as much as could be obtained from others, but deliberation and want of time and opportunity, etc. (Wald's Pollock on Contracts, 592, 593, *Murray* v. *Elston,* 24 N. J. Eq. 311; *Brock* v. *Barnes;* 40 Barb. 532.) The evidence on the question of value amply sustains the findings. (*Stephens* v. *Orman,* 10 Fla. 100; *Kimball* v. *Lincoln,* 99 Ill. 580; *Tennent* v. *Tennents,* L. R. 2 P. & D. 9; *Austin* v. *Chambers,* 6 Clark & F. 1; *Bierer's Appeal,* 92 Pa. St. 265; *Cowee* v. *Cornell,* 75 N. Y. 92; 31 Am. Rep. 428; *Billingslea* v. *Ware,* 32 Ala. 415; *Knight* v. *Marjoribanks,* 11 Beav 323; *Eyre* v. *Potter,* 15 How 61; Bispham's Equity, sec 219; *Hyer* v. *Little,* 20 N J. Eq. 449; *Mayo* v *Carrington,* 19 Gratt. 106; *Davidson* v. *Little,* 22 Pa. St. 251.) There was a presumption that Wilson and plaintiff discovered everything it was important for them to krow,—everything the books and correspondence would have disclosed. (*De Montmorency* v. *Devereux,* 7 Clark & F 228; *Chambers* v. *Waters,* 8 Cond. Eng. Ch. 392; *Motley* v. *Motley,* 45 Ala. 559, 560.) The principles regulating dealings between trustee and beneficiary do not apply; and if applied, do not justify relief under the circum-

stances. (*Korn* v. *Becker*, 40 N. J. Eq. 410; *The Melbourne etc.* v. *John Brougham*, L. R. 7 App. C. 307; *Stretch* v. *Talmadge*, 65 Cal. 510; *Gilchrist* v. *Brooklyn*, 66 Barb. 188–401; *Bybee* v. *Tharp*, 4 B. Mon. 324; *Philips* v. *Belden*, 2 Edw. Ch. 13; *Gage* v. *Parmelee*, 87 Ill. 337; 2 Pomeroy's Eq. Jur., sec. 1044; 2 White and Tudor's Eq. Cas., pt. 2, p. 1185, notes marginal page 593; Kerr on Fraud and Mistake, 151, 152; *Pratt* v. *Barker*, 1 Sim. 1; *Chambers* v. *Waters*, 1 Coop. Sel. Cas. 91; *Gibson* v. *Jeyes*, 6 Ves. 277; *De Montmorency* v. *Devereux*, 7 Clark & F. 188; *Kimball* v. *Lincoln*, 99 Ill. 580; *Knight* v. *Marjoribanks*, 11 Beav. 324; 2 Macn. & G. 11; *McKenzie* v. *Dickinson*, 43 Cal. 120; 2 Lindley on Partnership, 930, 932, 933, 1069; *McLure* v. *Ripley*, 2 Macn. & G. 274; *Chambers* v. *Powell*, 11 Beav. 6; *Sexton* v. *Sexton*, 9 Gratt. 212; *Johnson* v. *Fesemeyer*, 3 De Gex & J. 13; *Courtright* v. *Burnes*, 2 McCrary, 533; *Falk* v. *Turner*, 101 Mass. 495; *Callar* v. *Ford*, 45 Iowa, 331; *Hoyt* v. *McLaughlin*, 52 Wis. 283; *Klauber* v. *Wright*, 52 Wis. 303; *Bierer's Appeal*, 92 Pa. St. 265; *Motley* v. *Motley*, 45 Ala. 558; *Geddes's Appeal*, 80 Pa. St. 460; *Van Trott* v. *Wiese*, 36 Wis. 439; *Murrel* v. *Murrel*, 2 Strob. Eq. 152; 49 Am. Dec. 664; *Wagner* v. *Wagner*, 50 Cal. 76; *Belt* v. *Mehen*, 2 Cal. 159; 56 Am. Dec. 329; *Foster* v. *Rison*, 17 Gratt. 347; *Bowman* v. *Carithers*, 40 Ind. 90; Bigelow on Fraud, 234; *Hall* v. *Thompson*, 1 Smedes & M. 482; *Taylor* v. *Taylor*, 28 L. T., N. S., 189; *Knox* v. *Gye*, L. R. 5 H. L. 675; *Noyes* v. *Crawley*, L. R. 10 Ch. Div. 37, 38; *Pierce* v. *McClennan*, 93 Ill. 247; *Bispham* v. *Price*, 15 How. 162.) The finding of laches is conclusive of the entire case.

*L. D. McKissick*, also for Respondents.

Rescission, to be effective, must be prompt, and place the other party *in statu quo*. (Civ. Code, sec. 1691; 1 Wharton on Contracts, sec. 286; *Fratt* v. *Fiske*, 17 Cal. 384; *Barfield* v. *Price*, 40 Cal. 542; *Morrison* v. *Lods*, 39 Cal.

385; *Gifford* v. *Carvill*, 29 Cal. 592; *Herrin* v. *Libbey*, 36
Me. 357; *Miller* v. *Steen*, 30 Cal. 407; 89 Am. Dec. 124; *Her-
man* v. *Haffenegger*, 54 Cal. 164; *Fitz* v. *Bynum*, 55 Cal. 461;
*Henderson* v. *Hicks*, 58 Cal. 371, 372; *Collins* v. *Townsend*,
58 Cal. 608; *Bohall* v. *Diller*, 41 Cal. 536; *Wilson* v. *Sturgis*,
71 Cal. 229.)   If the parties cannot be restored to their
original position, there can be no rescission. (*State* v. *Mc-
Caulay*, 15 Cal. 458; *Lynn* v. *Bertram*, 20 How. 155; Kerr on
Fraud and Mistake, 328, 329, 334, 336, 338, 339.) Plain-
tiff has not offered to put defendant *in statu quo* respect-
ing their release of Colton's indebtedness, which was a
valuable consideration for the compromise. (*Schluter* v.
*Harvey*, 65 Cal. 159; *Frey* v. *Clifford*, 44 Cal. 335.) Delay
will bar relief when the property is of a speculative
character, and has enhanced in value. (*Sayre* v. *Gas Light
and Heat Co.*, 69 Cal. 213; *Hayward* v. *National Bank*, 96
U. S. 611; *Nicholson* v. *Janeway*, 16 N. J. Eq. 285; *Twin
Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Kitchen* v. *St. Louis,
Kansas etc. R'y Co.*, 69 Mo. 224.) The complaint charges
only a partnership and actual fraud, neither of which have
been proved, and there can be no recovery on any other
state of facts, since the *allegata* and *probata* must correspond.
(*Maynard* v. *Fireman's Fund Ins. Co.*, 34 Cal. 60; 91 Am.
Dec. 672; *Hicks* v. *Murray*, 43 Cal. 522; *Newham* v. *Kenton*,
79 Mo. 384–386; *Small* v. *Atwood*, 6 Clark & F. 279; *Hick-
son* v. *Lombard*, 1 H. L. Cas. 324; *Wilde* v. *Gibson*, 1 H. L.
Cas. 620–626.) The defendants were justified in making
their claims against Colton, and fraud cannot be pred-
icated of the assertion of those claims, made in good
faith, as they were sufficient to · sustain a compromise.
(*Franklin Ins. Co.* v. *Humphreys*, 65 Ind. 549; 32 Am.
Rep. 78; *Gates* v. *Shultz*, 7 Mich. 137; *Jackson* v. *Ashton*,
11 Pet. 229; *Eyre* v. *Potter*, 15 How. 42; *Hagar* v. *Thomp-
son*, 1 Black, 80; *Floyer* v. *Sherard*, 1 Amb. 18; *Morse* v.
*Royal*, 12 Ves. 355.) Misrepresentation or concealment
of facts known to plaintiff goes for nothing. (*Irvine* v.
*Kirkpatrick*, 3 Eng. L. & Eq. 17.) Valid partnership

settlements may be made upon a general view of accounts, without accurate knowledge, if there is no actual fraud. ( *Wagner* v. *Wagner,* 50 Cal. 76; *Farnum* v. *Brooks,* 9 Pick. 213; *Knight* v. *Majoribanks,* 11 Beav. 324; *Chambers* v. *Howell,* 11 Beav. 6; *Kimball* v. *Lincoln,* 99 Ill. 580; *Courtright* v. *Burnes,* 2 McCrary, 537; *Geddes's Appeal,* 80 Pa. St. 460; *Gage* v. *Parmalee,* 87 Ill. 330; *Coles* v. *Trecothick,* 9 Ves. 247; *The Melbourne Banking Corporation* v. *Brougham,* L. R. 7 App. C. 307; *White* v. *Walker,* 5 Fla. 478; *Turner* v. *Otis,* 30 Kan. 1; *Atlantic Delaine Co.* v. *James,* 94 U. S. 207; *Nicholson* v. *Janeway,* 16 N. J. Eq. 285; *Murray* v. *Elston,* 24 N. J. Eq. 310.) It is an important circumstance that plaintiff, and not defendant, sought the settlement. (*Morse* v. *Royal,* 12 Ves. 275; *Harrison* v. *Guest,* 6 De Gex, M. & G. 433; 8 H. L. Cas. 490, 491; *Montesquieu* v. *Sandys,* 18 Ves. 311, 312.) The following additional cases sustain the principles applicable to the facts found and decisions made in this case by the court below: *May* v. *Le Claire,* 11 Wall. 217; *Slaughter* v. *Gerson,* 13 Wall. 379; *Tuck* v. *Downing,* 76 Ill. 71; *Smith* v. *Curtis,* 19 Fla. 786; *Graham* v. *Castor,* 55 Ind. 559; *Brown* v. *Cawell,* 116 Mass. 461; *Light* v. *Light,* 21 Pa. St. 407; *Geary* v. *Bank of Georgetown,* 5 Pet. 98; *Malone* v. *Kelly,* 54 Ala. 532; *Sexton* v. *Sexton,* 9 Gratt. 204; *Turner* v. *Otis,* 30 Kan. 1; *Taylor* v. *Guest,* 58 N. Y. 262; *Currie* v. *Steele,* 2 Sand. 542; *Follansbe* v. *Kilbreth,* 17 Ill. 522; 65 Am. Dec. 691.

*Creed Haymond,* also for Respondents, cited *Bailey* v. *Fox,* 78 Cal. 389.

PATERSON, J. — From the fifth day of October, 1874, down to the time of his death, David D. Colton was associated with defendants in the ownership, control, and direction of certain corporations. Prior to that time defendants and Mark Hopkins had been the principal owners of the stock of the Central Pacific Railroad Com-

pany, the Southern Pacific Railroad Company, and of various other subordinate and connected railroad companies, and also of the Contract and Finance Company. They had associated themselves together for the purpose of securing the co-operation and assistance of all in the furtherance of certain railroad enterprises, and of such others as they should from time to time agree upon. In pursuance of the terms of their association and agreement, they had invested respectively large sums of money, and were giving their time and labor to the management and direction of the corporations above named, and to the acquisition and control of other corporations which they desired to operate in furtherance of the general schemes they then had and might thereafter have in view. Being desirous of securing the aid and co-operation of another associate, negotiations were opened with Mr. Colton, whom the defendants had known for several years prior thereto, which ended in an agreement between him and them that he should become associated with them in like manner as they had theretofore been associated with one another. By the terms of this agreement with the defendants and Mark Hopkins, Mr. Colton was to have twenty thousand shares of the capital stock of the Central Pacific Railroad Company and twenty thousand shares of the capital stock of the Southern Pacific Railroad Company, in consideration of the sum of one million dollars, for which sum he gave his promissory note, with interest at six per cent per annum, payable on or before October 5, 1879. All dividends on the stock were to be applied as payments on the note. It was agreed that Colton was to share in the proportion that his stock bore to the stock issued in all responsibilities, damages, penalties, etc., and to share in all the liabilities of the Central Pacific, Southern Pacific, and Contract and Finance companies, the same as if he had been associated and connected with them from the time of their organization. On the 15th of December, 1874,

they organized the Western Development Company, the affairs of which cut a most important figure in the controversy. The capital stock of this company was fixed at five million dollars, of which Stanford, Huntington, Crocker, and Hopkins each took two ninths and Colton one ninth. General Colton's interest in all other properties acquired by the associates came to him through this corporation, except that which he held in the Ione Coal and Iron Company, which had a capital stock of four million dollars, divided equally between the associates, and that which he held in the Colorado Steam Navigation Company, and in the Occidental and Oriental Steamship Company. He was also one of the original incorporators of the Southern Pacific Company of Arizona, organized in 1873, and held thirty thousand shares of the capital stock thereof.

In 1876 the parties made and executed a 'new agreement, which they antedated as of October 5, 1874. This agreement differs in some material respects from the original. A copy of it is annexed to the complaint, and is set out in the statement of facts. By the terms of this modified agreement the stock sold to Mr. Colton was pledged as collateral security for the payment of the one-million-dollar note, and it was agreed that neither party should sell his interest in the contract without the written consent of all parties thereto.

The enterprises entered into and carried on by these associates during the lifetime of Mr. Colton were of stupendous magnitude, involving face values amounting to hundreds of millions of dollars. The success of their schemes depended upon many things. In the midst of their most important operations both Mr. Hopkins and Mr. Colton were taken from the association by death, the former on March 29, 1878, the latter in October following. The bond of friendship which had bound the five associates together was of the strongest kind, and the confidence which one reposed in another had no limit.

Soon after the death of her husband, Mrs. Colton —
this plaintiff — began to make inquiries as to the inter-
est of the estate in the various corporations with which
Mr. Colton had been connected. In his last will and
testament Mr. Colton had recommended that if his wife
should desire the assistance of any one in the settlement
of his estate, his friend S. M. Wilson, and his secretary,
Charles E. Green, should be called in as co-executors.
Mrs. Colton, being the universal legatee, and entirely
ignorant of her husband's affairs, called upon and se-
cured the services of Mr. Wilson to aid her. Negotia-
tions were entered into between plaintiff and defendants
for a settlement. During these negotiations the plaintiff
became suspicious of the motives and conduct of the
defendants, believed that they had manipulated the
books to deceive her, and that they were unworthy of
*trust or confidence.* Nevertheless, after a thorough ex-
amination of the books and many interviews with de-
fendants, a compromise agreement was entered into on
the twenty-seventh day of August, 1879, by the terms of
which certain stocks, including 408 shares of the Rocky
Mountain Coal and Iron Company, were assigned to
defendants, the one-million-dollar note was canceled,
and all the liabilities of the Western Development
Company and other corporations were assumed by them,
and the estate of Colton was released therefrom.

About two years after the execution of the compromise
agreement, plaintiff discovered many errors in the cal-
culations upon which the compromise had been made.
She thereupon served a notice of rescission, and de-
manded a new accounting. A complaint was drawn up
charging the defendants with misrepresentation, con-
cealment, etc., and after several interviews, to wit, on
May 24, 1882, plaintiff commenced this action for a re-
scission of the compromise agreement of August 27, 1879
(referred to as exhibit F), on the ground that said agree-
ment had been procured through false and fraudulent

representations made by defendants during the course of the negotiations which resulted in the execution of the compromise.

The answer denies the charges of fraud, alleges that whatever statements were made by defendants were made by them in good faith, believing them to be true, and avers that Colton, during the time that he was connected with the Western Development Company, fraudulently appropriated to his own use certain large sums of money belonging to said company and to these defendants.

After a trial lasting nearly two years, before Hon. Jackson Temple,—who was at that time judge of the superior court of Sonoma County, and who has recently left this court on account of illness,—findings and judgment were rendered in favor of defendants. From this judgment, and an order denying the motion for a new trial, the plaintiff has appealed.

Although the record herein covers about twelve thousand pages of printed matter, there is no substantial conflict in the evidence. The questions involved in this appeal have been debated by counsel upon the assumption that the *facts* found by the learned judge of the court below are unassailable, and that the decision is correct, except as to the legal deductions drawn from the specific facts found.

It is not contended by the appellant that the defendants knowingly made any false statements or *intended* to deceive plaintiff in the negotiations, but it is claimed that the facts found show the existence of a fiduciary relation between plaintiff and defendants; that in dealing with plaintiff it was the duty of the defendants to make a full and correct disclosure of the condition of the business in which Colton held an interest, whether the plaintiff was relying upon their advice or upon her own investigation and the advice and judgment of Wilson and other friends; that it is immaterial whether

the parties believed there was in fact any such duty resting upon the defendants, or whether the plaintiff did actually rely upon and confide in them; that where the negotiations begin in peace and confidence between trustee and *cestui que trust*, it matters not that suspicion, distrust, and fears may lead the beneficiary to make independent investigation during the negotiations, and rely upon independent advice, and her own judgment, in finally concluding the compromise; that the trustee can shake off the duty referred to, if at all, only by a clear and unequivocal dissolution of the trust relation before the negotiations commence; that the business relation between Colton and defendants was a partnership, and that the surviving partners were bound to know the condition of the business, and impart full information thereof to plaintiff; that in cases of this kind the surviving partners must show affirmatively that the settlement was fair and the consideration adequate, the contract being *prima facie* void; that the court erred in ignoring this principle, and in holding that it was for plaintiff to prove fraud; that the findings show both actual and constructive fraud and threats, and that the representations made by defendants with respect to the ownership of the 408 shares of Rocky Mountain Coal and Iron Company stock are sufficient of themselves to call for a reversal of the judgment; that the judgment should be reversed, and a judgment entered in favor of the plaintiff on account of undue influence, concealment, and fraudulent misrepresentations, although it be conceded that the parties making the contract herein sought to be rescinded dealt as strangers, and that the findings do not cover the material issues; and that the court erred in its conclusions of law, and as to the effect of certain evidence.

Many of the topics discussed by counsel are involved in the question whether there existed such a fiduciary relation as called for a full, fair, and accurate statement

by defendants of the condition of the affairs of the
several corporations in which Mr. Colton, in his life-
time, had been interested; counsel for appellant con-
tending all the time that such relation did exist, and
that by virtue of their superior knowledge and means of
information, the duty of making a full disclosure and
truthful statement by defendants became imperative and
absolutely essential to the validity of any compromise
based upon negotiations between the parties. The re-
spondents have claimed at all stages of the litigation that
the business relation of the several associates was not that
of partners, and that upon the death of Mr. Colton the
defendants owed plaintiff no duty other than that which
arises from the relation of stockholders in a corporation.
In this branch of the controversy the learned judge of
the court below sided with the respondents, and upon
this subject he expressed his opinion in the following
language: "At no time were the defendants, Leland
Stanford, C. P. Huntington, Charles Crocker, and Mark
Hopkins, copartners, or associated in any business or
enterprise as copartners. Nor did they at any time
carry on any business as copartners," etc. "At the
death of Colton the association between him and the
defendants and Mark Hopkins entirely ended and
ceased. There was no property belonging to the asso-
ciates, as such. After his death, the plaintiff was merely
a stockholder in the various corporations. . . . . After
the death of Colton, the individual defendants had no
other power over the affairs of the plaintiff, and occu-
pied toward her no other relationship, than as control-
ling the corporations in which she was a stockholder, and
as creditor and pledgees. . . . . But if a trust relation
of this character existed between these associates, what
was the relation of the survivors, upon the death of
Colton, to his representative? At his death, the associ-
ation was entirely ended. It was a case where confi-
dence was given for confidence, service for service.

There was no property belonging to the associates, as such. No power over the affairs of Mrs. Colton or the estate of D. D. Colton survived his death. His position was one of great power over many things, through this mutual confidence. She was merely a stockholder in various corporations. It is true, they continued to be virtual directors of these corporations, as they and Colton had previously been. But this no longer depended upon any confidential relations with the holders of Colton's stock. . . . . The previous relations with Colton did not affect the question. They and Colton had no vested interests in any new projects not yet begun. . . . . There was not, then, after Colton's death, any further active duties, as trustees, due from defendants to the estate of Colton." (8 W. C. Rep., Supplement, 31.)

It must be admitted, however, that the arguments of the appellant upon this question are most persuasive, and make the business relation which existed between the associates look like a partnership for the purpose of organizing, controlling, and operating railroad and other corporations; but in view of the manner in which the compromise was effected, and of all the circumstances surrounding the settlement of the dispute, we deem it unnecessary to determine this particular question. There is no doubt that the associates occupied toward one another relations of the greatest confidence and trust. This relation of trust and confidence, indeed, was one of extraordinary character, greater than ever existed in any partnership with which we have been acquainted. The power and authority possessed by each associate over the business, property, and standing of others interested with him never was possessed, perhaps, by a member of any other concern or association. That there was a relation of mutual trust and confidence of high character between the associates, and that such relation was recognized by Judge Temple, is apparent from the

following extracts taken from his findings and opinion:
" Some of their transactions in the payment and dis-
bursement of money were private and confidential be-
tween said associates, the character and reason of such
disbursements being known only to and by said asso-
ciates, and not recorded or entered in any books or writ-
ings kept by them, or any of said corporations, and said
five associates until the death of said Hopkins, and said
four associates thereafter until the death of said Colton,
had and assumed and sustained relations of intimate and
peculiar trust and confidence, each toward and with the
others, in regard to their said enterprises and their man-
agement and conduct; and they acquired, obtained, and
had confidential information and control each concern-
ing and over the affairs of the property and business
connected with, growing out of, and accumulated by and
through the enterprises in which said Stanford, Hunt-
ington, Hopkins, Crocker, and Colton were associated
together.   As each new scheme was determined upon,
each had his part in the work, though each party then
decided for himself whether he would go into each
scheme or not, and there was no power in the majority
to commit any one to any new enterprise until he ap-
proved of it."   " Fiduciary relations may exist between
stockholders of various corporations who have asso-
ciated themselves to control such corporations and make
them work in harmony; but they would not be partners.
And so I conclude, although the corporations managed
by these associates cannot be regarded as partnerships,
nor as mere instrumentalities of a partnership, the re-
lation between the parties was nevertheless of a fiduciary
character.   I think it already appears that the parties
to the agreement, exhibit A, intended something more
than to procure situations for each other as employees in
various corporations.   They had designs not stated in
that paper, which were the real purposes of that associa-
tion.   The fiduciary relation must have existed under

our code as to these projected enterprises, and the management of the system of roads they had built and acquired. . . . . Each had invested his money and expended his labor in reliance upon this fidelity of the others." (Page 30, Supplement.)

It is a nice question whether the trust relation which had existed between the associates continued to exist after the death of Colton, and impose any active duties upon the survivors as trustees of his estate; but if any such duties were cast upon the defendants by reason of the death of Mr. Colton, they were waived by the plaintiff herself, and the relation of trustee and *cestui que trust* was so entirely discarded and dissolved during the negotiations that they were not bound by any fiduciary relation to counsel, advise, and protect the plaintiff, or to perform any other duty than to deal fairly by her, and in good faith to disclose all facts within their knowledge material for her to know in conducting the negotiations fairly, and to enable her to make a full and unhampered investigation into the matters in controversy.

We have been unable to find a case in which a lump agreement of compromise, entered into by surviving partners and the representative of a deceased partner, or by a trustee and *cestui que trust*, — the latter acting by the advice of experts and able counsel, and renouncing all confidence in the trustees, — after full, fair, and honest investigation, has been rescinded because of actual and unintentional inaccuracies discovered subsequent to the execution of the agreement; nor do we know of any universal rule of equity, or any provision of our code, tending to establish the proposition that from the mere fact of a prior existing fiduciary relationship everything in the absence of proof must be presumed against the trustee who has entered into a contract with his *cestui que trust*, regardless of the question whether confidence has in fact been reposed and abused. Of

course, in all trust relations the existence of confidence will be presumed, and if it appear that any advantage has come to the trustee in dealing with his *cestui que trust*, the burden will be thrown upon him to show that confidence was not in fact abused. But it has always been held, as we understand it, that this presumption might be overcome by proof of the fact that confidence had not been abused, and that the beneficiary acted, not upon any reliance or confidence placed in the trustee, but upon the advice of an independent, professional, disinterested, and competent adviser. There is a distinction to be made between transactions occurring directly between the trustee and his beneficiary, and those transactions in which the trustee deals with himself or another party. Thus if a trustee, in the execution of his trust, sells property to himself, the transaction may be set aside by the *cestui que trust* as void, without giving any reason or alleging any fraud, or any disadvantage or inadequacy of price. In such case there are no two parties to the contract, the trustee dealing with himself alone; but where the trustee deals directly with the *cestui que trust*, the latter having for himself an independent adviser, and the trustee making no pretense of advising him, the transaction is not voidable at the election of the beneficiary, but it will devolve upon the latter, if he would set it aside, to show some reason therefor. He must show either actual or constructive fraud. Of course, the fraud may be shown in some instances by presumptions.

Section 2219 of the Civil Code provides: "Every one who voluntarily assumes a relation of personal confidence with another is deemed a trustee, within the meaning of this chapter, not only as to the person who reposes such confidence, but also as to all persons of whose affairs he thus acquires information which was given to such person in the like confidence, or over whose affairs he, by such confidence, obtains any control."

Section 2228 is as follows: "In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." Section 2229 is as follows: "A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner." Section 2235 is as follows: "All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration and under undue influence."

That these provisions are consistent with the rules of equity, as we have construed them, is apparent, we think, when read in connection with the following provision: "The person whose *confidence* creates a trust is called the trustor; the person *in whom confidence is reposed* is called the trustee; and the person for whose benefit the trust is created is called the beneficiary." (Civ. Code, sec. 2218.) These provisions show that the fundamental principle of the relation of trustee and *cestui que trust* is that of confidence.

In the case at bar Mrs. Colton not only did not rest any confidence or reliance upon anything said, done, or omitted to be said and done, by the defendants, or any of them, but she called in and secured the aid of four or five disinterested and competent advisers; among these was Mr. S. M. Wilson, one of the leaders of the bar of this state, a man of irreproachable character, in the prime of life, for twenty-five years the warm personal friend of her husband, and the man whom he had recommended on his death-bed, and she was fully informed by him as to her legal rights. She also obtained the services of Mr. Lloyd Tevis, a skillful and successful financier, to

assist Mr. Wilson in his investigations as to the business of the corporations. The investigations made by these gentlemen and the plaintiff lasted for over six months, and were most thorough, careful, and diligent. It is found, as a matter of fact, that they had sources of information other than those possessed by the defendants, and that they were in fact more thoroughly acquainted with, and better qualified to form an accurate judgment as to the condition of, the affairs of the company than any of the defendants. Mrs. Colton had also the advice of Mr. Steinberger, an old friend of her husband, and the advice and assistance of Mr. Green, his secretary for many years, and of Mr. Douty, who was a cousin and intimate friend of General Colton, and a business man of great capacity and experience, and a skillful and expert accountant. All the claims preferred by the defendants on their own behalf were fully discussed, considered, and investigated. The subject-matters of the negotiations were of the most complicated nature, consisting in part of accounts running through many years, and recorded in many volumes of books and thousands of vouchers and papers relating in part to the transactions, some of which had gone out of the memory of the parties thereto. The court found as a fact, and it seems practically undisputed, that during the negotiations defendants were ready and willing to answer, and did truthfully answer, all questions asked them, and submitted freely all the books and accounts in their possession, or under their control, to the inspection and investigation of the plaintiff and her agents. The plaintiff and her agents knew, partly from discoveries they made themselves, and partly from information given by the defendants before the compromise agreement was executed, that there were many inaccuracies in some of the statements furnished to the plaintiff. Among other important matters in dispute between the parties, and which were compromised, was the right to Western Develop-

ment Company dividends, amounting, according to plaintiff's valuation, to over half a million dollars. At the time the negotiations were in progress, the plaintiff saw no justice whatever in the transaction; her heart rebelled against the whole matter  She believed that the defendants were unworthy of any credit or confidence, and were endeavoring by all the means in their power to cheat and defraud her. She suspected that the defendants had made some of the charges against her husband, knowing them to be false, and that they had manipulated their books to sustain those charges. No source of information was withheld from them; no means of ascertaining intelligently the true state of the accounts were covered up before they acted upon and compromised the matters upon which the controversy arose; every fact which has since been discovered could have been discovered before the execution of the compromise agreement, as well as thereafter; the witnesses who could throw any light upon the matters in controversy were within their reach. Mrs. Colton was most anxious to make the settlement. The defendants "insisted that they were not bound to discount the future of their securities for her, thus giving her the benefit of their contemplated enterprises and the expenditure of more millions. She was not entitled to the profits when she would not share the risks." The property in controversy was of immense value,— chiefly speculative value. Mr. Tevis "was known as a bold, enterprising, and successful speculator. He was intimately acquainted with the railroads, and was a man of great wealth, abundantly able to pick up the burden where Colton had dropped it, and carry it along without asking any favors from the defendants," all of which was known to the plaintiff at the time she acted upon his advice and accepted the terms of the compromise. (Findings 18, 55, 57; Supplement, p. 67.)

The findings show that the defendants in good faith

disclosed every fact within their knowledge. There is nothing in the findings to show that plaintiff or her agents were misled as to any matter except the statement in regard to the number of shares of the Rocky Mountain Coal and Iron Company stock, which they claimed to own, though held by Mr. Colton. Of this matter we shall speak hereafter.

Here, therefore, we have a case in which — assuming the existence of a fiduciary relation, and that the presumptions as to confidence and the burden as to proof are as claimed by appellant — the undisputed facts show that there was absolutely no confidence reposed by the beneficiary, but that she acted exclusively upon the advice of several disinterested experts and professional friends, specially selected to investigate and counsel her, because of their ability and familiarity with the affairs of the trustees with whom she was dealing, and who acted toward her in the highest good faith.

To hold that, *under such circumstances,* a contract entered into by the parties compromising and settling disputes of the must doubtful character and value cannot stand if it subsequently appear that the trustee did not impart to the *cestui que trust* not only all the knowledge of the transactions of which he was possessed, but all that he might have acquired by diligent and skillful search, would be to place an absolute embargo upon all settlements of disputed questions between parties holding trust relations, although equity favors the amicable adjustment of claims which, like those involved in this settlement, bid fair to become a fruitful source of litigation. Under such a rule it would be difficult to find men fit to be trustees who would accept such a trust; there would be no inducement to compromise doubtful matters, however advantageous the settlement might seem to be to the *cestui que trust,* and no trustee, or his sureties, who had settled with his *cestui que trust,* would feel secure in his position until either time or circumstances

had dispelled every possible chance of a successful contest based upon new evidence or a rise in values. Such a construction of the provisions of our code would not only place them in antagonism to all the authorities which have explained and applied the rules of equity governing such contracts between trustee and *cestui que trust*, — and the code provisions are but a digest of these rules, — but would convert a rule intended to prevent fraud into one creating an incentive to and a cover of fraud; because it would afford a convenient method for a party who had repudiated any reliance upon or trust in his trustee, and who had acted upon the advice of independent, skilled, and disinterested champions and his own investigations, to turn around when subsequent facts showed that the bargain was to his disadvantage, and say in effect: "It is true, I did not place any confidence in your statements, and told you that I should not, but should rely on my trusted agents. It is true, I acted only in my own interest, being sole legatee. It is true, you laid before me all the means of information, and I and my agents assumed to act upon them. We had the means of information, and might have discovered the truth, but were not fully informed. It is sufficient to say that *you* did not correctly represent the condition of the business. It was your duty to do so. I admit that you acted honestly and fairly; that you did not intend to misrepresent any fact, or any value, and I admit that my means of information were as good as yours were. It matters not that I gave you notice in advance, I should not trust you in anything you said or did, but should rely upon the investigations and advice of my friends, because your representations were not correct. It was your duty to make them full, fair, and accurate. I claim a rescission upon the representations you made, although I did not believe them." If there is a case in which a court of equity has decreed a rescission under such circumstances, it has not been called

to our attention.   Whatever may have been said as to the presumptions arising out of proof of a fiduciary relation, the fundamental principle upon which rescission is granted is always, and under all circumstances, the claim and consideration that *confidence has been reposed and that confidence has been abused.*   No such claim can in reason be made where the party seeking the rescission—being of competent age and understanding, and acting only in his own interest—has undertaken to investigate for himself, called in experts, been given free and fair means of ascertaining the truth, acted upon his own judgment and the advice of friends, and repudiated any confidence in or reliance upon the parties with whom he was dealing.   It matters not what the relations of the parties have been prior to or are at the time of the negotiations for a settlement and compromise of their disputes, the principle is one of universal application, and it is a principle of common sense and of good policy.

It is unnecessary for us to review the authorities on this subject.   They will be found, we think, to fully support the views we have expressed, and in order to make as brief as possible this opinion, which, perhaps, is already unnecessarily extended on this question, we simply cite some of the cases, without commenting upon the peculiar features of any of them.   We have examined the cases cited by appellant, and find nothing in them which conflicts with what is said herein.   (*Kimball* v. *Lincoln,* 99 Ill. 578; *Gage* v. *Parmalee,* 87 Ill. 330; *Casey* v. *Casey,* 14 Ill. 113; *Farnum* v. *Brooks,* 9 Pick. 213; *Knight* v. *Majoribanks,* 11 Beav. 324; *Morse* v. *Royal,* 12 Ves. 355; *Hunter* v. *Atkyns,* 3 Mylne & K.; *Hagar* v. *Thompson,* 1 Black, 80; *Cartright* v. *Burnes,* 2 McCrary, 532; *Geddes's Appeal,* 80 Pa. St. 460; *White* v. *Walker,* 5 Fla. 478; *Hall* v. *Johnson,* 41 Mich. 289; *Bowman* v. *Carithers,* 40 Ind. 90; *Turner* v. *Otis,* 30 Kan. 1; *Murray* v. *Elston,* 24 N. J. Eq. 310; *Korn* v. *Becker,* 40 N. J. L. Eq. 408; *De Montmorency* v. *Devereaux,* 7 Clark & F. 188; *Hough* v. *Richardson,* 3

Story, 690; *Loesser* v. *Loesser*, 81 Ky. 139; *Motley* v. *Motley*, 45 Ala. 558; *Kisling* v. *Shaw*, 33 Cal. 425.)

It is claimed, however, that the trustee cannot, after negotiations are begun between himself and his *cestui que trust*, dissolve the trust relation, " and place the parties at arm's-length," and that " the rights of these parties and the rules by which they are to be investigated should be determined by the relation of the parties *when their negotiations commenced."* We see no reason for such distinction. Sudgen's definition of the rule applicable in such cases is expressed in the following language: " It must not be understood that a trustee cannot buy from his *cestui que trust* where he is *sui generis;* the rule is, that he cannot buy from himself. If the *cestui que trust* clearly discharges the trustee from the trust, and considers him as an indifferent person, he may purchase; but it must clearly appear that the purchaser, *at the time of the purchase*, had shaken off his confidential character by the consent of the *cestui que trust*, freely given after full information and bargaining for the right to purchase." (2 Sugden on Vendors, 417, bottom paging 693.) There is nothing in this text, or any decision we have seen, requiring a contract preceding the contract to purchase, or compromise, giving the trustee permission to purchase, as a basis for a second contract in which the terms of the sale, or compromise, may be lawfully agreed to. If *at the time of the purchase*, or compromise, the trustee has shaken off his fiduciary character, and the confidence which is presumed to result therefrom, it matters not what has occurred immediately preceding or long prior to the final transaction. In other words, if the transaction is one in which the trustee may lawfully deal with his *cestui que trust* by first dissolving the trust relation, it is not too late for him to do so at any time before the *cestui que trust* is prevented from making a full and fair investigation and consideration of the business in hand, and before he executes the contract.

Other points discussed at the bar are involved in the question whether plaintiff was induced by fraud, actual or constructive, to enter into the compromise agreement; whether there were false representations, concealments, threats, or any unconscionable advantages gained by defendants through their superior opportunities and power.

Upon every material issue of fact the court below found in favor of defendants, except as to a part of the 408 shares of Rocky Mountain Coal and Iron Company stock, and its finding of fact upon that issue was, in the opinion of the court, insufficient, in view of other findings, to support a decree of rescission.

Since it is claimed, however, that the specific facts found do show fraud, concealments, and undue advantage, notwithstanding the general findings of the court, which negative the charges thereof, it becomes necessary to look into the circumstances under which the compromise was effected.

So far as the exhibits of the condition of the Western Development Company (exhibits D and E) are concerned, the facts found show that there was no fraudulent representation by defendants as to anything contained therein, and that plaintiff did not rely upon them. She relied upon her own judgment and the advice of those who were assisting her, and entered into the compromise agreement after a careful and thorough examination of all the books and vouchers. The court finds that she was not ignorant of any fact or circumstance material to her rights; that there were no misrepresentations or concealments by defendants, but, on the contrary, they answered truthfully all questions relating to the affairs of the company, repeatedly went over the subjects under investigation with Mr. Wilson, and gave him free access to all the books, and secured for him all the assistance and information in their power. The defendants did not pretend to know anything of the condition of the

affairs of the Western Development Company outside of what was shown in its records. Mr. Wilson knew this. They told him so. They gave him every facility in their power of ascertaining the true state of the accounts. They instructed their employees to aid him as best they could. With their consent and approval he had the books carefully and thoroughly examined by experts,— men who had been trusted friends of General Colton,— one of them his cousin, another his secretary. In no part of his testimony does Mr. Wilson indicate that he or the plaintiff placed any reliance upon the statements contained in exhibits D or E, or upon any information furnished by the defendants with regard to the affairs of the Western Development Company. Mr. Wilson was active, alert, self-reliant, and zealous in the cause of his client, — the widow to whom he had been recommended by his friend Colton as the one man worthy of entire confidence and trust in case of trouble. Spurred on by a keen sense of the trust which had been reposed in him, he devoted his entire time and energy for a period of about six months, laboring with clerks and book-keepers, until, as he says, he had exhausted and tired himself out, sacrificed his own interests, and had "abused these people to the extremity almost of fighting personally." In connection with his deposition in this case, there was introduced in evidence his memoranda, taken during the investigations which he and others were making into the affairs of the Western Development Company, which showed the most unmistakable care and a painstaking and minute consideration of the subject. Upon this showing, no doubt, it was that Judge Temple was induced to believe and find that plaintiff and her advisers were ignorant of no material fact or circumstance of which she ought to have been informed. The presumption would follow from the fact of investigation that everything material was discovered; but the presumption is fortified by the introduction of these memoranda,

and by proof of the fact that many others had been made which at the time of the trial were lost.

Under such circumstances, is plaintiff entitled to a rescission of the contract thus deliberately entered into? We think she is not. Her counsel claim that there was actual and constructive fraud, and cite sections 1571 and 1572 of the Civil Code; they say that defendants furnished a list of the assets of the Western Development Company; that this was equivalent to a positive assertion that the list contained all the assets,— an assertion not true, not warranted by the information of the parties making it, and therefore fraudulent, although they believed it to be true; that where a party, acting without belief or without information, makes a representation which is not true, the law imputes to him a knowledge of its falsity, and makes him as fully responsible as if he had such a knowledge. This is true as a general proposition, where the other party has acted upon the representation, relying upon it as correct; but the rule as stated is not upon authority or principle applicable where such party, discarding the representation as unworthy of belief, proceeds to inquire for himself, is given full and fair facilities of informing himself, takes independent counsel, and finally acts upon his own judgment and that of his advisers. Misrepresentations cannot be predicated upon such a state of facts. (2 Parsons on Contracts, 770; *Percival* v. *Horgar*, 40 Iowa, 289; *Matthews* v. *Bliss*, 22 Pick. 53; *Von Trott* v. *Weise*, 36 Wis. 439; *Hall* v. *Johnson*, 41 Mich. 289; *Light* v. *Light*, 21 Pa. St. 413; *Smith* v. *Kay*, 7 H. L. Cas. 775; *So. Development Co.* v. *Silva*, 125 U. S. 258; Bigelow on Fraud, 7, 8.)

We do not find anything in the authorities cited by the appellant which is in conflict with the views we have expressed. Excerpts from a few of them will show this to be the case. Thus in *Taylor* v. *Fleet*, 1 Barb. 475, the court said: "If the purchaser has acted upon his own judgment, and has not been influenced by the

misrepresentations, however untrue they may have been, he has no right to be released from his bargain. But I cannot concur with the counsel for the vendor in his position that the purchaser examined the land with a view to test the accuracy of the representations made by Fleet. On the contrary, all the witnesses agree that no personal examination of the land would enable any person not previously acquainted with its capabilities to determine whether the statements made by Fleet were true or not. The only means of knowledge within his reach was information to be obtained from those whose experience enabled them to speak from actual observation with respect to the material question which constituted the object for which the purchase was made."

In *Rawlins* v. *Wickham*, 3 De Gex & J. 310, the books showed so plainly the fraud that any man of ordinary capacity could have detected the fraud. The court there says: "During the negotiations for the partnership a paper was produced, which has been kept by Mr. Rawlins from that time, giving an account of the assets of the concern. The amount due to the customers of the bank was there stated to be eleven thousand pounds and a fraction. Upon examination of the books it appears that the real amount exceeded this by many thousands, a fact which an examination of the books by any person of the most ordinary competency would have shown. . . . . Was there any excuse for such a misrepresentation? As regards Mr. Bailey, there was none. He was a professional man, taking an active part in the affairs of the bank, and it was his duty to know them, whether he did or not. Mr. Wickham was an inactive partner, knowing but little of its affairs, attending only occasionally at the bank, not meddling with the books, and probably knowing little or nothing of what they contained. . . . . He joined with Mr. Bailey in producing the statement of accounts which I have mentioned, and in ascribing accuracy to it. Now, he ought

not to have asserted what he did not know to be true. He ought to have said, 'It may be true; I have a good opinion of Mr. Bailey and Mr. Gattrill, but I am not acquainted with the books, and, as far as I am concerned, you must look at them for yourself.' He did not do so, but joined in a representation which was not true, and, for every purpose of pecuniary liability, the case is the same as if he had known that it was not true. . . . . Mr. Rawlins might have inspected the books. . . . . He, however, did not examine them, and, improbable as it may appear, I must hold that Mr. Rawlins entered into the partnership in complete ignorance of the contents of the books, and continued so for four years. . . . . He was entitled to believe their representations to be accurate without looking at the books. He was entitled to continue in that belief *until ground for suspicion arose, or information was given him by one of the partners. No such information was given. They did not complain that he did not look at the books, and there is reason to believe that they would not have liked him to examine them.*" The difference between this case and the case at bar is too apparent for comment.

In *Higgins v. Samels*, 2 Johns. & H. 467, the language of the court shows the distinction between the case and the one at bar. It is there said: "It is not necessary to show that the defendants knew the facts to be untrue, if they stated a fact which was untrue *for a fraudulent purpose, they at the same time not believing that fact to be true.* In that case it would be both illegal and immoral fraud. . . . . What weighs upon my mind is the circumstance that the quality of the lime *was not a mere subject of speculation,* but a fact which the plaintiff, without any special familiarity with the business, could have made himself acquainted with."

In *Carpmeal* v. *Powis*, 10 Beav. 44, the court uses this language: "Mr. Powis offered to procure the information. He did procure it, and communicate it to the plain-

tiff, who relied upon it, and entered into the agreement on the credit of it. It turned out to be erroneous; but before the agreement, and until long after the agreement, Mr. Powis appears to have had no reason whatever to suspect that there was any error. *He adopted it implicitly on the authority of Mr. Cuthbert, and very innocently produced it to the plaintiff as a true statement of that upon which the amount of the annuity was to be calculated.* If the plaintiff was guilty of any error or laches, it was in giving too much credit to the statement which had been adopted and communicated to him by the defendant's agent as true."

In *Miller* v. *Craig*, 6 Beav. 437, it appears that the plaintiffs, who lived in Scotland, never had an opportunity of examining the accounts. The court said that there was no proof whatever that the plaintiffs relied on Miller as their agent in the treaty with the other executors. On the contrary, they employed their own solicitor, or law agent, in Scotland. The release was signed in confidence, in the belief that the accounts had been truly stated.

In *Reynell* v. *Sprye*, 1 De Gex, M. & G. 709, the court says: "It was said during the whole of the negotiations Captain Sprye not only left Sir Thomas Reynell at perfect liberty to consult his friends and professional advisers, but even on several occasions recommended him to do so. To a great extent this certainly was the case; and if the relief sought in this suit had rested on mere mistake, if Captain Sprye had not, by misrepresentations of fact, *which I cannot treat as unintentional,* led Sir Thomas to believe that his rights were different from what in truth they were, it may be that the argument to which I am now adverting would have prevailed. In such a case, perhaps, this court might have considered that it was the folly of Sir Thomas Reynell to have acted without advice, and might have refused to assist any person who was so singularly little alive to his own

rights. . . . . But no such question can arise in a case
like the present, where one contracting party has *intentionally misled the other* by describing rights as different
from what he knew them really to be."

In *Doggett* v. *Emerson*, 3 Story, 732, it appeared to the
court that the purchase of the plaintiff was made upon
an entire credit given to the representation of Williams
as to the quantity and quality of the timber. The plain-
tiff resided in Boston, and confessedly had no knowledge
of timber lands, and had never seen the township in
which they were situated. He must therefore have
placed implicit reliance upon the statements of Wil-
liams. It appeared, also, that Emerson not only knew
the contents of the certificates upon which the plaintiff
relied, but corroborated the statements therein contained.

In Lewin on Trusts, cited by appellants, the author
says: " Before any dealing with the *cestui que trust*, the
relation between the trustee and *cestui que trust* must be
actually or virtually dissolved. . . . . The parties must
be put at such arm's-length that they agree to stand in
the adverse situations of vendor and purchaser, the *ces-
tui que trust* distinctly and fully understanding that he
is selling to the trustee, and consenting to waive all
objections upon that ground, and the trustee fairly and
honestly disclosing all the necessary particulars of the
estate, and not attempting a furtive advantage to himself
by means of any private information. . . . . Where the
*cestui que trust* took the whole management of the sale,
himself chose, or at least approved, the auctioneer, made
surveys, settled the plan of sale, fixed the price, and so
had a perfect knowledge of the value of the property,
. . . . Lord Eldon said that if, in any instance, the rule
was to be relaxed by consent of the parties, this was the
case. . . . . Again, a *cestui que trust* had urged the pur-
chase upon the trustee, who at first expressed an unwill-
ingness, but afterward agreed to the terms, and the sale
was supported. So where the trustee had endeavored in

vain to dispose of the estate, and then purchased himself of the *cestui que trust* at a fair and adequate price, and there was no imputation of fraud or concealment, Lord Northington said: 'He did not like the circumstance of a trustee dealing with his *cestui que trust*, but upon the whole he did not see any principle upon which he could set the transaction aside. . . . . If it be absolutely necessary that the property should be sold, and the trustee is ready to give more than any one else, he may file a bill in chancery, and apply by motion to be allowed to purchase, and the court will then examine into the circumstances, ask who had the conduct of the transaction, whether there is reason to suppose the premises could be sold better, and upon the result of that inquiry will let another person prepare the particular sale, and allow the trustee to bid.'" (Sec. 463.)

In *Boyd* v. *Hawkins*, 2 Dev. Eq. 208, we find this language: "The prohibition of the trustee to purchase from the *cestui que trust* himself is not found to be so absolute. . . . . Bargains between them are viewed with anxious jealously. It must appear that the relation has ceased, *at least that all necessity for activity in the trust has terminated, so that the trustee and cestui que trust are two persons, each at liberty, without the concurrence of the other, to consult his own interest, and capable of vindicating it; or that there was a contract definitively made, the terms and effect of which were clearly understood, and that there was no fraud or misapprehension, and no advantage taken by the trustee of the distresses or ignorance of the other party.* The purchase must also be fair and reasonable."

Mr. Pomeroy, in his work on Equity Jurisprudence, at section 855, uses this language: " When parties have entered into a contract or arrangement based upon uncertain or contingent events, purposely as a compromise of doubtful claims arising from them, and where parties have knowingly entered into a speculative contract or transaction,— one in which they intentionally speculated

as to the result, — and there is in either case an absence of bad faith, violation of confidence, misrepresentation, concealment, and other inequitable conduct mentioned in a former paragraph, — if the facts upon which such agreement or transaction was founded, or the event of the agreement itself, turn out very different from what was expected or anticipated, this error, miscalculation, or disappointment, although relating to matters of fact, and not of law, is not such a mistake, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief, either by way of canceling the contract and rescinding the transaction, or of defense to a suit brought for its enforcement. *In such classes of agreements and transactions the parties are supposed to calculate the chances, and they certainly assume the risks, where there is no element of bad faith, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud."*

In *Badger* v. *Badger*, 2 Wall. 87, it appears that Brooks took advantage of his position as partner, agent, and brother-in-law of Martin intentionally to conceal from the latter the prosperous condition of the concern, and purchased his interest for a price totally disproportioned to its real value.

So, also, in *Addington* v. *Allen*, 11 Wend. 383, there appeared an actual intent to mislead and defraud the plaintiff.

In *Safford* v. *Grout*, 120 Mass. 26, the character of the representations was not disclosed by the record. No objection was made that they were mere expressions of opinion, judgment, or estimate, or that they were intended to be understood as expressions of belief only. The court said: "We must presume that they were legally sufficient to support the action; that is to say, that they were statements of facts susceptible of knowledge, *as distinct from matters of mere opinion or belief;* and that they were calculated to have, and did have, material

influence in deceiving the plaintiff as to the maker's means and ability to pay in inducing them to part with their property."

All that is decided in *Redgrave* v. *Hurd*, L. R. 20 Ch. Div. 24, is, "that where a false representation has been made, it lies upon the party who makes it, if he wishes to escape its effect in avoiding the contract, to show that, although he made the false representation, the defendant, the other party, did not rely upon it. The *onus probandi* is on him to show that the other party waived it, and relied on his own knowledge. Nothing of that kind appears here."

In *Wells* v. *Millett*, 23 Wis. 67, the court assume that if the defendant had been careless or indifferent to ordinary and accessible means of information as to the truth or falsehood of the representation which has been made, he would have had no right to rely upon that.

In *Rohrschneider* v. *Knickerbocker L. Ins. Co.*, 76 N. Y. 218, 32 Am. Rep. 290, the court said that "the fraud was really undisputed. The managers of the defendant had made the false representations, and they *knew them to be false*, as the dividends of the company never had paid the notes thus given for the one half of the annual premiums. But on the contrary, such dividends had always fallen far short of making such payments; and they must have known that they generally, if not always, would fall short. There was, in fact, no foundation or excuse whatever for making the untrue representations. . . . . It is said on behalf of the defendant that the plaintiff did not rely upon these representations, and was not induced by them to take the policy. But there was sufficient evidence from which the jury could have found that she did thus rely, and was thus induced."

In *Baker* v. *Spencer*, 47 N. Y. 564, the court said that the appellant's claim that the settlement of the action by the giving of a three-hundred-dollar note operated as

a compromise of the alleged fraud, and was a bar to the
action, might have been well taken if it had appeared,
from the pleadings or the findings, that at the time of
the settlement the defendant had knowledge of the facts
constituting the fraud alleged; but that such claim was
not well founded, being based entirely upon the state-
ment, that, after giving the note, the plaintiff began to
suspect that the defendant had not the right to sell and
transfer the agency.   The court said: "It does not ap-
pear, from the complaint or findings that the plaintiff
had any grounds for his suspicion, or any information
on the subject, nor what defense was interposed on the
trial before the justice in the action on the five-hundred-
dollar note."   The court then proceeds to distinguish
the case before it from the case of *Adams* v. *Sage*, 28
N. Y. 103.   In the latter case, the court held that "where
a party to whom representations were made has the
means at hand of determining their truth or falsehood,
and resorts to such means, and after investigation,
avows his belief that the statements are false, and acts
upon such belief by bringing an action to recover
money obtained from him by means of the fraudulent
representations, he is not entitled to credit when he
alleges that upon reiteration of the truth of the same
statements by the same party he was induced to enter
into an agreement to settle the suit, and was thereby
defrauded.   Such investigation and ascertainment of
facts, and belief in the falsity of the representations
made, exclude the idea that any reliance could have
been placed upon the repetition of the falsehood, and
the verdict of a jury or finding of a referee to the
contrary should be set aside as unsustained by the
evidence.   Indeed, upon such evidence, it would be
error to submit to a jury the question whether reliance
was or was not placed upon the reiterated false repre-
sentations.   Under the circumstances assumed, the law
presumes that the party relied in making the agreement

upon his own investigation, and not upon the representations of the party with whom he is dealing. This conduct in acting in opposition to the knowledge acquired by inquiry from one who knows the facts is attributable, and is set down by the law, to his own indiscretion and recklessness, and not to any fraud or surprise of which, under the circumstances, he has any right to complain. . . . . In 2 Parsons on Contracts, 270, the rule is laid down, in relation to defenses to actions on the ground of false representations, that it must appear that the injured party not only did in fact rely upon the fraudulent statement, *but had a right to rely upon it in the full belief of its truth, for otherwise it was his own fault or folly, and he cannot ask of the law to relieve him.* Many of the cases cited by the author to sustain this rule hold that if the truth or falsehood of the representation might have been tested by ordinary vigilance and attention, it is the party's own folly if he neglect to do so, and he is remediless."

In *Perkins* v. *Gay*, 3 Serg. & R. 331, 8 Am. Dec. 653, the court said: "It is a principle of equity that the parties to an agreement must be acquainted with the extent of their rights, and the nature of the information they can call for respecting them, else they will not be bound. The reason is, that they proceed under an idea that the fact which is the inducement to the agreement is in a particular way, and give their assent, not absolutely, but on conditions that are falsified by the event. [Citing cases.] But where the parties treat upon the basis that the fact which is the subject of the agreement *is doubtful,* and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid notwithstanding any mistake of one of the parties, provided there be no concealment or unfair dealing by the opposite party that would affect any other contract. . . . . *Every compromise of a doubtful right depends on this principle.* . . . . There is an

express mutual abandonment of their former rights
upon an agreement, that, whether they be good or
whether they be bad, neither is to recur to them on any
pretense whatever, or claim anything that he does not
derive from the terms of the agreement. Each takes
his chance of obtaining an equivalent for everything
he relinquishes, and if the event turn out contrary to
his expectations, so much the worse for him. If there
be no intention of fraud, no unfair dealing, and neither
party has more knowledge of the fact misconceived
than the other had, the contract will bind."

In *Peek* v. *Derry*, L. R. 37 Ch. Div. 577, while the court
did not attribute to the defendants any intention to com-
mit a fraud, it found that they had made a statement
which was incorrect to induce the plaintiff to act upon it,
*without any sufficient reason for making that statement, or
any sufficient reason for believing it to be true.*

Kerr on Fraud and Mistake thus states the proposi-
tion: " If a man to whom a representation has been
made knows at the time, or discovers before entering
into a transaction, that the representation is false, or
resorts to other means of knowledge open to him, and
chooses to judge for himself in the matter, he cannot
avail himself of the fact that there has been misrepre-
sentation, . . . . *or say that he has acted on the faith of
the representation.* . . . . If the party to whom the rep-
resentations were made himself resorted to the proper
means of verification before entering into the contract,
it may appear that he relied on the results of his own
investigation and inquiry, and not upon the representa-
tions made to him by the other party. . . . . If the sub-
ject is in its nature uncertain, if all that is known is
matter of inference, or something else, and if the parties
making and receiving representations on the subject
have equal knowledge and means of acquiring knowl-
edge, it is not easy to presume that the representations
made by the one could have much or any influence upon

the other." (Pages 75–78.) Speaking of fiduciary relation, the author says: " A transaction between them [trustee and *cestui que trust*] will be supported if it can be shown to the satisfaction of the court that the parties were, notwithstanding the relation, substantially at arm's-length, and on equal footing, and that nothing has happened which might not have happened had no such relation existed. The burden of proof lies in all cases upon the party who fills the position of *active confidence* to show that the transaction has been fair. If it can be shown to the satisfaction of the court that the other party had competent and disinterested or independent advice, or that he performed the act, or entered into the transaction voluntarily, deliberately, and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power of influence to which the relation gave rise, the transaction will be supported."

In *Shaw* v. *Stine*, 8 Bosw. 159, it is held that the true test in cases of false representations may be found in the inquiry whether the plaintiff would have entered into the contract if the false representations had not been made. If he would, then the false representations did not contribute to the sale.

In *Matthews* v. *Bliss*, 22 Pick. 53, it is held that, where one of the parties has an advantageous knowledge, if he exercise a studied effort to prevent the other from coming to the knowledge of the truth, or if there be any, though slight, false and fraudulent suggestion or representation, then the transaction is tainted with turpitude, and alike contrary to the rules of morality and of law.

In *Gilbert* v. *Endean*, L. R. 9 Ch. Div. 268, there was a material fact intentionally concealed, namely, that the son was without means, because the father was still alive, and was still refusing to assist him.

Some of these cases, it will be observed, involve transactions between trustee and *cestui que trust*, and are applicable to the first proposition discussed herein.

After the execution of the compromise agreement, the Western Development Company paid an indebtedness of over three million dollars, with interest, to the Central Pacific with Southern Pacific bonds at ninety cents on the dollar. These bonds were represented to plaintiff to be worth sixty cents on the dollar. It is now claimed that the transfer to the Central Pacific, a few days after the compromise, at ninety cents on the dollar *is conclusive evidence* that they were worth ninety cents on the dollar at the time they were represented to be worth sixty cents, and that this was a fraud on the plaintiff,—at least, that there is an equitable estoppel preventing defendants from claiming that they were not worth ninety cents at the time of the compromise. The transaction seems to to have been one in which the defendants practically dealt with themselves. They paid off the debt of the Western Development Company to the Central Pacific company with bonds of the Southern Pacific company, and themselves fixed the value of the bonds at what they supposed they would be worth when they should be called on to pay the Central Pacific bonds. Equitable estoppels must be mutual. If the defendants in attempting to pay off some debt similar to that of the Western Development Company, about the time the compromise was effected, had rated the Southern Pacific bonds at twenty-five cents on the dollar, would their act fix irrevocably the market value of the bonds so that Mrs. Colton would have been bound *by their act, and forever thereafter estopped from proving that in fact they were worth more?* The transaction was but a temporary mode of settling up a corporate obligation. The court weighed it as evidence, and as the intrinsic value of the property did not enter into the questions involved in the compromise, we do not perceive any ground upon which plaintiff can complain. (*Fitz* v. *Bynum*, 55 Cal. 461; 2 Sutherland on Damages, 374; *Kountz* v. *Kirkpatrick*, 72 Pa. St. 389.) Furthermore, the values set opposite to the names of the stocks

mentioned the court finds were not relied upon, and in
fact the controversy was chiefly over this very matter,
Mr. Wilson insisting all the time that they were too low,
and the defendants contending that they could not afford
to allow more for them.

The charge that Mrs. Colton was induced by threats
to enter into the contract is unequivocally denied by
Mr. Wilson in the following testimony:—

"Q. Now, in the course of these negotiations, did the
defendants, or any of them, make any threat in refer-
ence to aspersing the memory of General Colton unless
a settlement was made, or anything of that kind? A. No,
sir; nothing of the kind."

Counsel for appellant rely with much confidence for a
reversal of the judgment upon the twentieth finding of
the court, which is as follows:—

"That the individual defendants, prior to the execu-
tion of the contract, exhibit F, and during the negotia-
tions which preceded and led to that contract, stated and
represented to the plaintiff that D. D. Colton had in
his hands, and standing in his name on the books of said
company, 408 shares of the capital stock of the Rocky
Mountain Coal and Iron Company, which were in truth
and in fact the property of and belonged to Stanford,
Huntington, Crocker, and the estate of Mark Hopkins,
in equal proportions, and which were held by said Colton
in trust for them and said estate of Mark Hopkins, and
that upon paying the plaintiff, as successor of said D. D.
Colton, the cost price of said 408 shares of stock, which
they represented to be $6,625.92, they were entitled to
have said 408 shares assigned, transferred, and delivered
to them; that the plaintiff relied upon said statement
and representation, and accordingly did assign and trans-
fer said shares of stock by and in said agreement and
contract sought to be rescinded by this action; that said
representation was not true, and was made by said defend-
ants without due circumspection, and was unwarranted

by the facts within their knowledge; that in truth and in fact said Colton did have in his possession, and there were standing in his name on the books of the company, only 240 shares of stock, which he held as trustee of said defendants and the estate of Mark Hopkins, and to the extent of 168 shares said representation was a false representation; that said representation, however, was not made with any actual fraudulent intent, but through inadvertence and lack of due circumspection; and that said contract would have been executed by the plaintiff had she known the truth in regard to said stock, if the defendants, upon being made aware of the facts, had still insisted upon it; that during the negotiations which resulted in the making of the compromise expressed in exhibit F, Mr. S. M. Wilson knew precisely what the claim of defendants was as to the aforesaid 408 shares of said Rocky Mountain Coal and Iron Company stock; had the books of last-mentioned corporation before him, including the dividend-book; knew that Colton had collected dividends for several years on said 408 shares of stock; knew that the claim of defendants to said 408 shares of Rocky Mountain Coal and Iron Company's stock was supported by no written evidence.

"Defendants also claimed from the estate of Colton the dividends on the stock of the Rocky Mountain Coal and Iron Company, which they asserted he held in trust for them."

It is contended that this finding conclusively establishes the fact that plaintiff was induced to enter into the contract by a false representation as to a material fact; that it is immaterial whether the representation was the result of an innocent mistake, it having been made without due circumspection, which is the equivalent of a positive assertion of a fact without knowing it to be true, or being warranted by the information of the person making it; that it is not necessary the false representation should have been the sole or control-

ling inducement to the making of the contract, it being sufficient to defeat the contract if it appear that it was one of the inducements and a motive of her action; that the court could not say as a matter of fact or matter of law if she had known the truth in regard to the stock she would have executed the contract, provided the defendants, upon being made aware of the facts, had still insisted upon it.

There are cases in which it could not be said, in view of the evidence, that the party would have entered into the contract if the false representation had not been made, and there are many cases reported in which the courts have said that it was error to apply the rule referred to. But where it clearly appears from the evidence that the contract would have been made if the truth had been known, we see no reason why the court may not find the fact and act upon it. If, as a matter of fact, the contract would have been made without regard to the character or force of the representation relied upon for a rescission, the plaintiff cannot complain. As said by Judge Temple: " The power to cancel a contract is a most extraordinary power. It is one which should be exercised with great caution,—nay, I may say, with great reluctance,—unless in a clear case. A too free use of this power would render all business uncertain, and, as has been said, make the length of a chancellor's foot the measure of individual rights. The greatest liberty of making contracts is essential to the business interests of the country. In general, the parties must look out for themselves."

Our code provides that a contract may be rescinded " if the *consent* of the party rescinding . . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence." (Civ. Code, sec. 1689.) Section 1565 of the Civil Code says: "The consent of the parties to a contract must be,—1. Free; 2. Mutual; and 3. Communicated by each to the other."

Sections 1566, 1567, and 1568 of the Civil Code read as follows:—

"Sec. 1566.   A consent which is not free is nevertheless not absolutely void, but may be rescinded by the parties, in the manner prescribed by the chapter on rescission."

"Sec. 1567.   An apparent consent is not real or free when obtained through,—1. Duress; 2. Menace; 3. Fraud; 4. Undue influence; or 5. Mistake."

"Sec. 1568.   Consent is deemed to have been obtained through one of the causes mentioned in the last section *only when it would not have been given had such cause not existed.*"

The most that can be said in support of appellant's contention is, that there is a conflict in the decisions on the subject, but the sections of the Civil Code above quoted are clear and unambiguous in language, and they seem to establish the rule beyond all controversy that the contract cannot be rescinded when it appears that consent would have been given and the contract entered into notwithstanding the duress, menace, fraud, undue influence, or mistake relied upon.   A misrepresentation as the basis of rescission must be material; but it can be material only when it is of such a character that if it had not been made the contract would not have been entered into.   The misrepresentation, it is true, need not be the sole cause of the contract, but it must be of such nature, weight, and force that the court can say "without it the contract would not have been made."

That the code commissioners recognized the fact of a conflict of authority upon this subject, and desired to settle it in accordance with what seems to us to be the plain meaning of the language used in section 1568, Civil Code, is apparent, we think, from the authorities quoted by them in a note to that section.   Thus in *Flight* v. *Booth*, 1 Bing. N. C. 376, the court said: "It is extremely difficult to lay down from the decided cases any

certain, definite rule which shall determine what misstatement or misdescription in the particulars shall justify a rescinding of the contract, and what shall be ground of compensation only. All the cases concur in this, that where the misstatement is willful or designed, it amounts to fraud; and such fraud, upon general principles of law, avoids the contract altogether; but with respect to misstatements which stand clear of fraud, it is impossible to reconcile all the cases; some of them laying it down that no misstatements which originate in carelessness, however gross, shall avoid the contract, but shall form the subject of compensation only; . . . . whilst other cases lay down the rule that· a misdescription in a material . point, although occasioned by negligence only, not by fraud, will vitiate the contract of sale. In this state of discrepancy between the decided cases, we think it is, at all events, a safe rule to adopt, that where the misdescription, although not proceeding from fraud, is, in a material and substantial point so far affecting the subject-matter of the contract that it may reasonably be supposed that but for such misdescription the purchaser might never have entered into the contract at all, in such case the contract is avoided altogether, and the purchaser is not bound to resort to the clause of compensation." In *Shaw* v. *Stine*, 8 Bosw. 159, a case also cited by the code commissioners, the court said: "The true test in such cases may be found in the inquiry whether the plaintiff would have sold the goods if the false representations had not been made. If he would, then the false representations did not contribute to the sale, for he would have made the sale without them." They also cite section 1819 of the Civil Code of Louisiana, which reads as follows: "The error in the cause of a contract, to have the effect of invalidating it, must be on the principal cause when there are several; this principal cause is called the *motive*, and means that consideration without which the contract would not have

been made." (See also the cases cited by appellant, and reviewed herein on another topic.)

Here the court found that plaintiff never intended after the death of her husband to go on with the enterprises in which he and the defendants had been interested; that she did not intend to take any further risks in the business ventures; that the transaction was a lumping settlement, all parties understanding it to be such, and that no accurate adjustment of the accounts could be had; *that the representation as to this stock was made without any actual fraudulent intent, but through inadvertence, and the plaintiff would have executed the contract sought to be rescinded had she known the truth in regard to the matter if defendants had insisted on it;* that Wilson knew exactly what defendants' claim as to the stock was, had the books of the company, including the dividend-book, examined them, knew that Mr. Colton had collected dividends, and that defendants' claim was not supported by any written evidence; that Wilson made a thorough investigation into the affairs of the Rocky Mountain Coal and Iron Company, *and had many sources of information other than those possessed by the defendants,* and was more thoroughly acquainted with and better qualified to form an accurate judgment as to the condition of the affairs of that company than were the defendants, or either of them; that Mr. Douty, cousin and friend of Mr. Colton, and book-keeper of said company, Mr. Green, secretary of General Colton in his lifetime, and Mr. Steinberger, an old friend, frequently consulted with plaintiff and Wilson with regard to the business in hand; that plaintiff placed no reliance upon the defendants, and had no confidence in them; and that before consummating the agreement, she had discovered many inaccuracies in the statements they had presented. At that time there was one error in the account of the Western Development Company, which would, if known, have shown the liabilities of that company to be one million dollars greater than they were represented.

In a transaction involving such vast properties and values as we find here, the amount involved in this particular transaction is comparatively a small item,—only about ten thousand dollars. But if the defendants had relied upon their strict rights in regard to this stock, they would have been entitled to receive back the dividends on the 240 shares wrongfully appropriated, with interest on each one from the time it was so taken, and plaintiff would have been entitled to receive the purchase price of the 240 shares, and interest upon it from the time it was paid. So that if the truth had been stated, and the controversy as to this particular stock had been settled upon a fair accounting, plaintiff would not have been more than one thousand or two thousand dollars better off than the settlement left her. From all the circumstances of the case, Judge Temple concluded that this representation as to the 168 shares had no material influence. It is true, the judge states "that the plaintiff relied upon said statement and representation, and accordingly did assign and transfer said shares of stock by and in said agreement and contract sought to be rescinded in this action." Plaintiff believed —at least assumed— the statement of defendants as to this stock to be true, and therefore assigned it. This is entirely consistent with the finding that she would have executed the compromise agreement had she known the truth in regard to the stock. From all the circumstances, especially the testimony of Mr. Wilson, it is made very clear that this representation was not an inducing cause of plaintiff's action. Speaking upon this subject, the court, in its opinion, said that "Wilson concluded it would do no good unless he could satisfactorily explain away charges of appropriating one hundred and eighty-one thousand dollars. In comparison with these figures, the sum involved in this unwarranted assertion is small. But I think, on general principles, in a matter of such magnitude as this, such a mistake or misrepresentation would not justify

setting aside the agreement, especially where, as here, expenditures have been made by the defendants on the faith of the agreement, which have materially enhanced the value of the property involved in the litigation." In these observations of the learned judge we fully concur.

It remains only to consider whether there was any unconscionable advantage taken of plaintiff. This question must be determined, not in the light of subsequent events, but upon the circumstances existing at the time of the negotiations and the execution of the contract. The court found that defendants did not obtain great advantage, or any advantage, over plaintiff, and that the agreement was fair, just, and equal.

The question whether there has been an undue advantage—an unconscionable exercise of a superior power—depends largely upon the situation of the parties at the time of the negotiations.

The immediate cause of the trouble between the parties arose from the fact that after the death of General Colton, who had been president and treasurer of the Rocky Mountain Coal and Iron Company from January 1, 1871, until the time of his death, the books and papers of that corporation showed that he had used large sums of money belonging to that company, for which he had never accounted. He had also taken large amounts which he designated as salary, in contravention of the terms of his agreement with Mr. Crocker, and with the other associates. There were also some serious irregularities in his account with the Western Development Company, of which he had been manager from its organization in December, 1874. The latter company was heavily in debt. It owed at that time to Stanford, Crocker, and the estate of Hopkins over ten million dollars. Its assets consisted chiefly of railroad stocks and bonds which had no market value. Mrs. Colton concluded before the commencement of the negotiations that she could not go on with

the enterprise in which her husband had been interested. (These facts are found by the court.)

In one of the preliminary interviews with Mr. Crocker, when asked whether she wished to pay for the stock purchased by Mr. Colton, and continue along in the execution of the corporate schemes which her husband had helped to advance, she replied that "she was in no condition or state to build railroads"; and her chief adviser, Mr. Wilson, said in his testimony: "Very early in the conversations that I had with Mrs. Colton it was agreed and understood between us that she was to sell out her interest there, and not to remain in the railroad. That was our leading proposition from the beginning of my relation with the business, and we never swerved, or never wavered on that. . . . . We had made up our minds that she should not go ahead. . . . . We had already determined that she should not go ahead, and would get out if she should get a certain sum of money." It must be remembered that the plaintiff herself first sought a settlement,— a fact which deserves attention. As was said in *Morse* v. *Royal*, 12 Ves. 275, by Lord Eldon: "This is not a trustee looking around him and fixing his eye upon this property, as increasing in value. It is in evidence that Morse determined to sell it, and if he could not get what he wanted, that he would put it up at Garaway's; that he frequently teased Vanheylin to purchase it, who was reluctant, but at last said he would go the length of giving five thousand pounds." So in the case at bar, Mr. Huntington, in his deposition, says that he was teased into making the settlement. In many cases we have examined, the fact that the party endeavoring to rescind the compromise agreement made the first proposal, and persuaded the other party to enter into the agreement, has been adverted to and considered by the court as an important factor in determining the rights of the plaintiff to a rescission of the contract.

(*Harrison* v. *Guest*, 6 De Gex, M. & G. 433; *Montesquieu* v. *Sanoys*, 18 Ves. 311.)

The evidence before us shows, without conflict, that the defendants did not want to make the settlement with plaintiff which was made, or any settlement at that time. The circumstances were so unfavorable for the prosecution of the plans which had been laid out, that the surviving associates believed they required more help, financial and executive, rather than more property in the hands of and to be managed by the survivors. Mr. Wilson, in his deposition, referring to this matter, says: "Several times during our later negotiations they had stated that they did not care about buying her out; they would do it at certain prices, and at this rate; but they would prefer she should go on and meet her obligations, and be enabled to meet her advances for the needs of the building of the railroads, if they would be called for from time to time; that they would prefer that she should stay in; they wanted money; they had not any money to pay out, and they wanted money. They preferred to get money in rather than to pay it out." The court also found that the defendants, at the time they requested plaintiff to continue along with them in the corporation, offered to manage her interests for her as well as they could their own, and promised that she should receive the full benefit of their knowledge and experience, and that they would get every dollar they could, and "share with her to the last cent."

The Southern Pacific railroad was finished to the Colorado River, at Yuma, in September, 1877. Mr. Hopkins had always been opposed to building the road east of the Colorado, and for that reason the work of construction stopped at that point. After the death of Mr. Hopkins, which occurred on March 29, 1878, Mrs. Hopkins was very unwilling — in fact, was probably unable before the distribution of the estate, which was in process of administration — to furnish any money, and

for that reason opposed the Western Development Company engaging in any new schemes. As stated before, that company was, at the time, heavily indebted to various parties, and its assets consisted of unmarketable stocks and bonds. After the death of Mr. Hopkins the surviving associates concluded that they would build the road east. The organization of a new construction company had been agreed upon during General Colton's lifetime, and but a short time before his death the Southern Pacific of Arizona was incorporated, and he became a member thereof, with thirty thousand shares of the capital stock in his name. The associates had lost the aid and encouragement of both Mr. Hopkins and General Colton, in whose executive ability and good judgment they had unlimited confidence. On May 5, 1879, the supreme court of the United States affirmed the validity of the Thurman act, which took from the defendants twenty-five per cent of the net earnings of the Central Pacific to secure the government. At that time the Central Pacific was apparently the source of all income and credit to the defendants. The debt of the Central Pacific was over one hundred million dollars. The affirmance of the validity of this act threw the associates, especially Mr. Colton, into great despondency. He declared that the construction plant should be sold, and that no more road should be built until they had money laid up in bank. He declaimed bitterly against the communistic tendency of the times. It was a year of remarkable political excitement. There was a general business depression all over the country, and in fact, the whole commercial world, for a year or more preceding the time of these negotiations. In the midst of these negotiations, there was in session in this state a constitutional convention, which formulated and promulgated the constitution ratified in May, 1879. Into this constitution there were incorporated many new and novel features, especially those relating to the taxation of rail-

road property and the fixing of freights and fares. The outlook for the parties was very dark. Of course, it is easy to say, in the light of subsequent circumstances, that their fears as to the evil effects of the provisions of the new constitution were largely groundless, but there was a real panic in railroad affairs at that time. True, confidence was soon restored, and their fears have not been realized. It certainly is not the fault of these defendants that they became despondent during that period, or that the transactions, unfortunately for this plaintiff, were consummated during such gloomy times. It was impossible for them to discontinue their operations without utter disaster to all their enterprises. Their road was built several hundred miles into a desert. To make it useful at all, it was necessary to connect it with the eastern systems of railroads. There was actual danger of active competition. To make the road a success, this competition had to be headed off. The value of the assets of the Western Development Company depended almost entirely upon the completion of the road which had been projected. It is important, we think, that these facts should be remembered in determining the fairness of the transaction between the parties. It is the misfortune of the plaintiff that she had not the means or disposition to accept and act upon the proposition made by the defendants to continue on with them in their operations. It is an important fact to remember, too, that the demand for the rescission of the compromise agreement came from the plaintiff over two years after the execution of the contract, and at a time when the gloom and depression had given way to an active "boom" in railroad business,—a time when there was a most unprecedented demand for railroad securities, owing to which the defendants found themselves in a most prosperous condition. The court below evidently considered the matter of delay in bringing this action an important factor, especially as the plaintiff had successfully forced

a settlement upon the defendants, — at a time when many of their securities had no market value, when they were all subject to great fluctuation, and when the question of the solvency or insolvency of their concerns depended solely upon the market value of such securities, —and had deliberately entered into the settlement with full means of information, and upon full advice of many competent friends. The failure of plaintiff to inform herself as to the facts upon which she relied, and to proceed to rescind the contract until the property had, under fortuitous circumstances, become immensely enhanced in value, is an important circumstance to be considered. (*Nicholson* v. *Janeway*, 16 N. J. Eq. 285; *Murray* v. *Elston*, 24 N. J. Eq. 310; *Twin Lick Oil Company* v. *Marbury*, 91 U. S. 587; *Kitchen* v. *St. Louis etc. R'y Co.*, 69 Mo. 224.)

Mrs. Colton was determined to get out of the enterprises without waiting and taking her chances on creating a market. Her one ninth of the indebtedness due from the Western Development Company to Stanford, Huntington, Crocker, and the estate of Hopkins amounted to over eight hundred thousand dollars. If defendants had desired to take any advantage of plaintiff, their opportunities were unbounded. If they had simply refused to pay her any money, what would have become of her? They had a perfect right to refuse to buy her out or furnish her with money with which to meet her outside obligations. The estate was indebted to defendants to the extent of three quarters of a million of dollars, and was pressed with claims amounting to over one hundred and seventy-five thousand dollars. These claims could not have been met if defendants had not supplied plaintiff with money to pay them. They paid a note of Colton to Michael Reese, which alone amounted to over seventy-five thousand dollars. From October, 1878, to the time of the settlement, plaintiff had been allowed to draw about one hundred and seventy-five thousand dollars for her

own use, and to pay off the debts of the estate. The situation of the plaintiff at that time is best expressed in her own language. In a letter to Mr. Hunt, dated May 8, 1879, she says:—

"Now, I have managed wonderfully well. The railroad people agreed to let me draw for my household expenses. . . . . I have paid a note, bearing interest at eight per cent, of twenty-five thousand dollars. I have paid a note on call (no interest), in Europe, of nine thousand dollars. I have paid eighteen thousand dollars on a call note bearing eight per cent; a note of twenty-five thousand dollars, held by the National Gold Bank, of whom David was a director. I held one hundred shares of this bank stock, and I sold it for eighty-five cents to the bank, so I still owe them seven thousand dollars, which I am paying them interest on. They have treated me very nicely, but I wish to pay them as soon as possible. Then there were about three thousand dollars of bills coming in, owing on our country place for labor and lumber for improvements, other immediate obligations of a sacred nature of about three thousand dollars. Now, we have cut down at every turn and corner. . . . . They have once or twice asked if I was making investments, and the last time they drew they declined to allow me any more until we had made a settlement. This settlement I am anxious to make, and am waiting their moves. Now, you will see that I am not idle. I have had a hard struggle. I have lain awake nights wondering how I was going to pay a note coming due. I do not believe the railroad people will settle squarely with me. I am afraid I shall have trouble. I talk business with no one except my lawyer. I have had a sale of thorough-bred stock from the farm. I have sold the carriages and horses, except just such as we positively needed; I will send you a catalogue. While I have no business experience, I am learning that I have good judgment in many things, and when I depend

upon myself I do far better than when I depend on others."

As stated before, the defendants were under no obligations to purchase from the plaintiff. All parties were in great distress. Plaintiff was in need of money; so were the defendants. If defendants had desired to take an unfair advantage of Mrs. Colton, all that was necessary to accomplish their aim was the enforcement of their claims against the estate. No purchaser other than defendants for the securities in which the estate was interested could be found. Defendants were not to blame for that circumstance. If plaintiff had been put to a forced sale, and defendants had seen fit to take advantage of their position, and had purchased the interest of the estate at even nominal figures, could plaintiff have complained, except from a moral standpoint? Mr. Tevis was a man of great wealth, familiar with railroad matters, and the affairs of the companies in which the parties were interested. Defendants' statements as to values were mere matters of opinion, and they were so understood by everybody concerned. Mr. Wilson and Mr. Tevis were as competent to judge as to the value of the securities as were the defendants. The defendants did not deny that the stocks would be worth more in the future; they expressly so declared. They had confidence in their own ability and the eventual success of their enterprises; but plaintiff had no confidence in them or their schemes. It is the misfortune of the plaintiff—not the fault of defendants—that the prospect of success was so poor. We must be careful not to judge a transaction of this kind in the light of subsequent events. There is a natural inclination to do so.

It must be remembered, too, that Mrs. Colton was not destitute of coercive power: Mr. Tevis told defendants they could not afford to have litigation with plaintiff,—the widow of their old associate; that it would be prejudicial to themselves as individuals and to all their

enterprises; that she would have the sympathies of the public, etc. Staggering as they were under heavy burdens, litigation meant disaster. Their securities would be injured, and the expense of a protracted trial, such as would follow a full investigation into the affairs of the company, would seriously cripple them. Concessions had to be made on both sides, or ruin would fall upon both. Concessions were made, and they were honestly and fairly made. All parties acted upon their best information as to the amount and character of the property in controversy, and according to their best judgment as to the value thereof. Mr. Colton had undertaken to carry a burden which was beyond his strength, and for Mrs. Colton to attempt to carry it was a proposition which was entirely discarded as an impossibility before the negotiations began. The inability of plaintiff to go on was as embarrassing to defendants as it was to her. By the terms of the compromise plaintiff was released from corporate liabilities amounting to millions of dollars.

How can unfairness or inadequacy be predicated upon such conduct and such facts? The statement of the circumstances is sufficient, we think, to demonstrate the truth and justice of the finding of the court that defendants were guilty of neither threats, concealments, nor undue exercise of a superior position and power, but that the negotiations which culminated in the contract, exhibit F, were fair, just, and equal.

Other points are made by appellant which we do not deem necessary to consider at length. It is said that the findings do not cover the issues, that the court adopted an erroneous theory as to the relation of the parties,— tried the case on one theory and decided it on another; drew erroneous conclusions of law from the facts found, proved, and admitted; found conclusions of law where facts should have been stated; that the evidence is insufficient to justify the findings of the court in

certain particulars, — the most important of which are, the evidence shows, that Mr. Wilson was not an independent adviser; that Mr. Tevis was not possessed of information in regard to the affairs of the corporations to enable him to give reliable advice; that plaintiff would not have entered into the contract had she known the truth as to the stock; that many of the items set forth in that portion of exhibit D after the heading therein, "General D. D. Colton in account with the Western Development Company," were true or correct, and that Mr. Wilson was not informed how the account had been made up, or that the defendants had no personal knowledge of the correctness thereof.

Many of these points were not referred to on the argument, and most of them are apparently abandoned by at least a majority of appellant's counsel in this court. Nevertheless we have given careful attention to each and all of the points made in all the briefs. Some of those last referred to are involved in the questions we have considered at length in this opinion; the others, we think, are without merit.

The judgment and the order denying a new trial are affirmed.

McFARLAND, J., SHARPSTEIN, J., WORKS, J., and BEATTY, C. J., concurred.

Fox, J., not having heard the argument, and THORNTON, J., deeming himself disqualified, did not participate in the decision.