At the trial below defendant offered no proof, and the case was submitted on the evidence of the plaintiffs. Judgment was for defendant. The facts were as follows: Plaintiffs were the administrators of B. S. Brown, who owned certain stock and bonds of the C. L. & N. Railroad, of which defendant was president. During his lifetime, Mr. Brown, on occasions, advised with defendant with reference to said stock, sent to him his proxy to vote it, and offered to send his bonds for sale when they reached a certain price in the market, but never actually placed either his stock or bonds in defendant’s hands or control. After Mr. Brown’s death defendant advised the administrators that certain certificates of indebtedness held by the stockholders were about to be exchanged for bonds as per a circular letter which he enclosed, offering to attend to theirs, and adding that certain negotiations were “going on” for a lease of the road, and that Mr. Brown, during his lifetime, placed his stock in his control, “so that it could be placed with mine in any deal that was made. I desire to stiff do this, if it is desirable to the estate, and will, if you think it best to place it in my hands, act for you, if occasion offers to make it an object to have the stock ready.” This letter was dated December 18, 1894. Two days after, one of the administrators replied that he noted the remarks about the lease, and that he knew that Mr. Brown, while living, placed his stock under defendant’s *343 control, to be handled with his in any deal, and that “I think we shall have no objection to do this, provided you will keep us advised from time to time as the matter progresses.” The ■certificates were sent and mortgage bonds given in return. At the same time, December 22, 1894, defendant wrote that “he would keep them advised.” Six months later, July 19, 1895, defendant, as president of the Central Trust Company, advised that fractional certificates were being bought up by parties at ■fifty cents, and volunteered to dispose of theirs, if they desired. August 9, 1895, plaintiffs sent their certificates, and added: '“The administrators are desirous of making progress in closing up the estate, and, in accordance with an order of the probate court, are prepared to offer this stock for sale. If you or ,your friends desire it at a fair market price, we shall be glad to give your bid preference.” Defendant replied, stating that at the time there were no negotiations pending for either a sale •or a lease. He advised against a sale, and gave full reasons. Plaintiffs never acknowledged this letter, nor did they request any further information or advice, but five months later, viz., •on December 28, sent their stock through their agent, Prentiss, to the First National Bank of Cincinnati, to be sold at the best price obtainable — not less than forty. The price on the street was forty to forty-two. At this time defendant was in Columbus, where plaintiffs lived, and he called on Mr. Prentiss, but not with reference to this transaction. Prentiss was the agent •of plaintiffs to send the stock to Cincinnati, and for no other purpose. Upon learning that the stock had been sent to Cincinnati, defendant volunteered to aid Mr. Prentiss in finding a ■customer, or to give him any other assistance he could. Prentiss said that he would be glad to have him do so. On December 18, of the same year, defendant purchased, for one Brice, certain stock of this same railroad, paying fifty therefor. Upon returning to Cincinnati he made an offer of forty-seven and a quarter for plaintiffs’ stock on behalf of Brice. The offer was accepted, and the First National Bank, in remitting to plaintiffs, took credit for an excellent sale, as it was above the market price, and plaintiffs accepted the money and the stock was transferred. During November and early in December of this same .year, Goodheart & Company made two offers to the directors of *344 the C. L. & N. for a control of the stock. One offer was for fifty and another for sixty dollars per share. Both offers were refused, and Goodheart was informed that the stock could not be bought for less than $75 per share, and that no sale would be made unless the minority stockholders could sell their stock at the same price as the majority. About this time negotiations were also pending between the C. L. & N. and the C. P. & Y. Railroad looking to a lease of the former. Defendant had full knowledge of all these matters, but at no time did he disclose them to the plaintiffs. ' It is contended by plaintiffs that defendant, who was a large holder of stock, was working with Brice to secure control for said Brice. If such was the case, the evidence does not disclose when such alleged combination began. In February, 1896, the Pennsylvania Railroad Company purchased the control of the stock, paying seventy-five, and likewise the bonds, paying par. Plaintiffs estimate their damage at the difference between what they sold their stock and bonds and what they would have received from the Pennsylvania Railroad Company had they held until February, 1896.
The equitable power of this court is invoked to declare that special relations of trust and confidence existed between the parties, and that, therefore, defendant was trustee for plaintiffs.
A fiduciary relation exists in all cases in which influence has been acquired and abused — in which confidence has been reposed and b'etrayed.
The first question, therefore, is: Did such a relation, as a, fact, exist? (2 Pomeroy’s Equity Jurisprudence, 2d Ed., Section 956). If such a relation in fact existed, and defendant, in face of a fiduciary duty, through fraud or deception, caused a loss tc plaintiffs, he is liable.
Did fiduciary relation exist at the death of Mr. Brown? The evidence does not warrant the court in finding that, prior to defendant’s dealings with the plaintiffs, there was a definite fiduciary relation with Mr. Brown, of whose estate plaintiffs are administrators. There had been some dealings that may have had fiduciary color, and a careful examination, we think, will reveal nothing more.
Did fiduciary relations exist between the parties after the death of Mr. Brown? If so, did the relation exist at the time *345 plaintiffs parted with their stock? Construing the testimony-most favorably for plaintiffs, there was but one letter which possibly reposed trust or conferred authority upon defendant to act for them in reference to the stock. December 20, 1894, one of the plaintiffs wrote: “We think we shall have no objection to doing (as you ask), provided you will keep us advised from time to time as the matter progresses. ’ ’
The unmistakable language of this letter limits the authority to the matter that was at that time the subject of the correspondence and concerning which defendant said he would keep them advised. That was a certain proposed lease of the road that was “going on.” But the lease of the road was never made. Defendant, therefore, could not have given any favorable information with regard to something that never took place. Six months later, July 19, 1895 (during the interim there had been no correspondence), defendant, as president of the Central Trust Company, invited plaintiffs’ attention to the fifty cent offer for fractional certificates. At this time, it must be borne in mind, no negotiations were pending for a sale or a lease of the road, and, as far as the record discloses, there was nothing of a material nature that defendant failed to communicate to plaintiffs. To the above letter plaintiffs replied August 9, 1895, enclosing fractional certificate, and they say: “The administrators are desirous of making progress in closing up the estate, and, in accordance with the order of the probate court, are prepared to offer this'stock for sale. If you or your friends desire it at a fair market price, we shall be glad to give your bid all preference.”
Acting under the independent advice and order of the probate’ court, indifferent to any advice defendant might have given on request, not induced in any way to make this offer by the suggestio falsi or the suppressio veri of defendant, suppose that under these conditions defendant, though trustee, had accepted this invitation to purchase, and did purchase, for a fair and reasonable price, could plaintiffs be heard to complain? We think not.
A court of equity, it is true, scrutinizes closely the dealings between trustees and beneficiaries, and it will presume that the trustee has dealt unfairly. But this presumption can be over *346 ■come by evidence that there was no undue influence, no 'fraud,, no imposition'; that all facts within the knowledge of the trustee, or which should have been within his knowledge, were communicated; that the beneficiary acted knowingly, voluntarily .and freely. The burden is on the trustee to show all of these facts. But, in the case before us, the evidence of the plaintiffs, in itself, rebuts the presumption. Plaintiffs, it is evident, were .acting under independent advice, and this of itself goes a great distance in overcoming the presumption of unfairness that arises in eases of this character (Pomeroy’s Equity Jurisprudence, :2d Ed., Section 958; see also Colton v. Stanford, 82 Cal., 351). Not only did plaintiffs as administrators act under the order and advice of the probate court, but in addition they were men of .affairs, not unacquainted with the value of the stock, and they lad full access to all sources of information.
In Waldrop v. Leaman (which was a case involving dealings between trustee and cestui qui trust), 30 S. C., 449, it was said:
“If the parties are of full age, sui juris, and capable of understanding their rights, with full opportunity of ascertaining them, under no disability, advised of all the circumstances eon■eerning the matter, or in a situation by reasonable and proper diligence to be thus advised, and they proceed, they must abide •the result, and should their actions subsequently result in loss, there is no reason why a court of equity should be invoked to •protect them from loss.’’
It will be further nested that on receipt of plaintiffs’ letter -offering stock for sale, defendant immediately, and under date of August 12, 1895, advised plaintiffs to hold, and gave full information.- So that even if plaintiffs neglected any of the '“opportunities that they may have had of ascertaining the value ■of the stock, ’ ’ or were otherwise remiss in acquainting themselves with its proper value, we find defendant himself supplying them with all possible material information. Upon this full disclosure there was no longer any superiority in the condition of the defendant over the plaintiffs. There was no vantage ground left to him from which to deal, and the purchase by him at this time under such conditions, even as a trustee, would have been ■upheld.
If, for the sake of argument, it were to be conceded that confidence or authority had been reposed in defendant by the letter *347 of December 20, 1894, it was completely revoked by the letter, of August 9, 1895. If a trust existed up to this time, it was now shaken off and terminated by a positive act and complete abandonment of it by plaintiffs (See Rhodes v. Bate, L. R., 1 Ch., 252, 260, Turner, L. J.).
Defendant, however, did not purchase the stock. On the contrary, after advising against a sale, he adds (see letter of August 12, 1895) :
“For, as Mr. Brown was with us through the trouble, and was a staunch friend, I am desirous his holdings get the benefit. I will be glad to give you any information I can at any time as to the railway, and, if I find a buyer, will advise you as to the price.”
This letter was never acknowledged or answered, and although mere silence is not always evidence that a trust has been “abandoned,” yet, in this particular case, when we remember the tenor and the purpose of the letter of August 9th, and the subsequent conduct of plaintiffs, we can not interpret it to mean anything but abandonment of whatever fiduciary relation may have existed. Neither can it be said that new duties gre.w out of. defendant’s last letter, for, if defendant invited confidence anew, plaintiffs never bestowed it by act or word. Merely because one renders gratuitous assistance to a friend, he does not, by so doing, enter into confidential relations (Fletcher v. Bartlett, 157 Mass., 113), or become an agent of the party he so advises (McNamara v. same, 62 Ga., 200). We interpret this letter to mean simply that defendant was ready and willing, when called on, to furnish information. Five months later, December 28, 1895 (cumulative evidence that plaintiffs, on August 9, 1895, had waived and terminated confidential relations, if any there were), and again, without relying on defendant; without seeking his assistance or advice; and in absolute disregard of him (also showing that they did not even avail themselves of his gratuitous offers of August 12th), plaintiffs send the stock to the First National Bank of Cincinnati for sale. We have seen that in November and December, Goodheart & Company had made certain offers for the stock, and that negotiations for a lease of the road were pending, all of which defendant knew. If plaintiffs did not wish to avail themselves of the *348 offers of defendant for information, what reason existed in law or equity for defendant, of his own volition, to continue to volunteer information, especially when it is seen that his last offer of information was ignored? If defendant could have purchased the stock at the invitation of plaintiffs,-under the conditions as they existed on August 12th, and whilst he was possibly a trustee, it is clear that afterwards, when the relation no longer existed as a fact, he was free to purchase as a stranger.
- Strieker & Johnson and Herbert Bradley, for plaintiffs in error.
Harmon, Colston, Goldsmith & Hoadly, for defendant in error.
As a second proposition, plaintiffs contend that in agreeing ' to aid plaintiffs find a customer for the stock, defendant became their agent for the sale thereof, and that as such, he was bound to fully disclose all facts likely to affect its value. In the first place, defendant made no agreement with plaintiffs direct. TTis agreement, if any there was, was with Prentiss, agent of plaintiffs. Did this agreement make him the agent of plaintiffs, thus necessitating disclosure? If defendant promised to aid Prentiss find a customer, this of itself did not make him the agent (See McNamara v. same, supra). And Prentiss, being but an agent with limited power, had no legal right to create an additional agent, or to otherwise confer authority upon defendant. The duty of Prentiss was to send the stock to Cincinnati. Having done this, his duty with reference to it ended; and it can not be claimed that defendant became a quasi trustee for plaintiffs because of the alleged agency established by Prentiss, unless there was in fact an agency. The burden of proving that he was an agent, as a fact, is on the plaintiffs (Spratt v. Wilson, 94 Ala., 608, 610). Has agency been established? Certainly Prentiss, of himself, created no power in defendant as agent, unless there was some subsequent ratification of Prentiss’ acts by his principals, namely, the plaintiffs.
But the proof fails to show such a ratification. We conclude, therefore, that defendant was under no duty to make any disclosure to plaintiffs at the time the stock was purchased.
The second cause of action seeks to recover damages for the sale of the plaintiffs’ bonds. The proof fails to show that the defendant had anything to do with the matter.
Judgment must therefore be affirmed.