[Civ. No. 11903.   First Dist., Div. One.   May 2, 1942.]

HERMAN MALINOW, Appellant, v. LENA DORENBAUM, as Executrix, etc., Respondent.

Henry S. Cohen and Bernard B. Cohen for Appellant.

Erlich & Alpert, H. P. Erlich and Arnold D. Alpert for Respondent.

MURPHY (E. P.), J. pro tem.—This is an appeal from a judgment in favor of defendant and respondent in an action brought by appellant to impress a trust upon certain real and personal property standing in the name of Glika Goldman, deceased, hereinafter referred to as the decedent. The defendant and respondent Lena Dorenbaum is the executrix of decedent's estate. Other named defendants were joined because they are banks in which the moneys involved were on deposit and they have no interest on this appeal.

The property here in litigation consists of several bank accounts standing in the name of decedent at the time of her death in 1940 but concededly the sole and separate property of appellant several years prior to that time. Also involved is a deed of trust to certain real property situate at Los Angeles, California, in which deed of trust the decedent is named as beneficiary.

The complaint alleged that a fiduciary relationship of trust and confidence existed between appellant and decedent and that the property involved was transferred to the name of decedent by appellant with the understanding that decedent would hold same in trust for appellant and upon decedent's promise and assurance that she would return same to appellant upon demand which, it is alleged, she failed and refused to do. The trial court so found and its findings in this respect are not challenged. However, in order properly to understand the issues raised on this appeal it is necessary to review the testimony concerning the relationship between appellant and decedent, the character of the property which constituted the trust res and the creation of the trust. It is substantially as follows:

Decedent was a niece of appellant and upon her arrival in California from Poland, her homeland, in 1926 she took up

her residence with appellant in his home at Los Angeles and continued to live there until the time of her death in 1940. At the time of her immigration decedent was 48 years of age and appellant was 68 years old. She came to this country, at appellant's expense, and took up her residence with appellant under an understanding that he would support her and she would be his housekeeper.

In 1933 and 1934 appellant made two equal deposits totalling $4,000 in the United States Post Office in the name of decedent. In 1938 these post office deposits were transferred to two bank accounts opened in the joint names of decedent and appellant and in 1939 the accounts were transferred from their joint names to the separate name of decedent. This transfer was made in July, 1939, following decedent's return from the hospital where she had undergone an operation for cancer in the year 1938. In 1937 another $1,000 bank deposit had been made by appellant in the name of decedent and it remained unchanged in any respect. Appellant testified that when he opened these accounts he told decedent that he was doing so to protect her in case he died first and that during his lifetime she was to turn the money over to him on demand, to which arrangement she consented. He testified that his reason for transferring the accounts to the sole name of decedent was because of her threat to leave him unless he did so. He testified that on several occasions he had requested decedent to return the money on deposit to him but that she always refused or postponed doing so, replying that she was ill and suffering and did not want to be bothered about it. It also appears that certain other moneys and real property were similarly transferred to decedent but subsequently returned to appellant. The deed of trust to the Los Angeles property was executed in 1935 and named decedent as beneficiary but appellant paid the consideration for same. A balance of $600 remained due under said deed of trust at the time of the filing of the complaint herein.

It appears that a few weeks prior to her death in 1940 decedent made a will, under the terms of which appellant was to receive, for life, the income from the property devised and bequeathed thereunder and thereafter the estate was to go to certain named beneficiaries. The evidence is undisputed that decedent at no time owned or possessed any property other than that here involved and, although her will was not received in evidence, it is clear that the property devised and be-

queathed thereunder is the same property that is the subject of this litigation.

In connection with the execution of decedent's will, the trial court found that appellant, by his conduct and acts, had not only acquiesced in decedent's asserted right to bequeath the property but had actively aided her in the making of the will and that he had, therefore, waived his rights and was estopped to claim the trust res as his own. Appellant contends that this finding is erroneous. We proceed, therefore, to a review of the testimony relating to the execution of the will.

Mr. Alpert, the attorney who drew the will, testified that about March 1, 1940, he was asked by respondent to go to the home of decedent to draw a will for her and that upon arriving there he was admitted by appellant who introduced him to decedent and told him that decedent wished to draw a will and that decedent "told me she had a few thousand dollars and other property and . . . she told me that she wanted the income of the property to go to Mr. Malinow" "and thereafter to go to her relatives and other friends, and some charity which is set forth in the will." He then testified that "At this point Mr. Malinow asked her what would become of him if he became ill, that he did not believe that the income would be sufficient to take care of him, so Glika Goldman turned to me and asked me if I could put a provision in the will that the bank would pay enough money over to him for his illness only, and no more, because she did not want any portion of it to go to his relatives. At that point he stated that he had had some disagreement with his relatives, that they did not treat him right, and that she did not want the money to go to his relatives." Later in his testimony, in response to a question asked by the court, the witness repeated that it was Mr. Malinow, the appellant, who stated to him that decedent did not want any of the property to go to his family because his relatives had not treated them well. He then testified that a week or two after the will had been drawn and sent to decedent, appellant brought it back to his office and told him that there were a couple of words in the will that decedent did not like and asked him to change them and that this was done and thereupon appellant paid him the sum of $10 and took the will with him.

The respondent, a neighbor of decedent, testified that she had known decedent for about three years; that appellant had told her that the doctor who attended decedent had stated that

decedent did not have long to live because she had a cancer; that appellant at that time asked respondent if she could recommend an attorney, whereupon she recommended Mr. Alpert and appellant then requested her to ask Mr. Alpert to come to his house to draw a will for decedent. Respondent also testified that it was at the joint suggestion of decedent and appellant that she was named executrix in the will.

One of the subscribing witnesses to the will testified that at the time she witnessed it appellant was present and stated to her that he wanted everything he had given decedent to go to her relatives and not to his own relatives because they did not care for him. She also testified that the possibility of appellant becoming ill and being unable to take care of himself was mentioned at the time and that appellant then stated he trusted respondent to take care of him. The other subscribing witness did not testify, but it was stipulated that her testimony, if given, would be to the same effect.

Appellant's testimony in regard to the execution of the will was as follows:

"Q. Now, will you relate to the court just what was said by you and what was said by her when she told you she was going to make a will?

"A. I said to her that she has no right to make a will because she has no property at all, it is all mine. There was a certain time that I assigned to her for fear that I may die first and she be left in poverty, she be a burden to everybody, I didn't want her to be a burden to anybody because my children didn't need anything of my estate, and also they are well fixed, I thought she have the benefit of it, serving in my house, waiting on me and so on, when I am dead she entitled to what I have, and I am perfectly satisfied she should have it when I am dead, but before I die the property is mine, was my savings, I say, 'from the last fifty years that I made in Los Angeles, you want to give away to strangers, is that right.'

"Q. What did she say?

"A. She said, 'Mrs. Dorenbaum told me that as long as I have property in my name, or anything in my name, that I have the right to give to anybody I want.'

"Q. Was there anything said in case you refused to carry out her wishes about making the will?

"A. She says she is going to Mrs. Dorenbaum's, she make the will over there if I won't let her make the will in my house.

"THE COURT: Let me see if I correctly understand you: You say on this occasion when you discussed making a will,

that she then said, in reply to your statement that she had no property, that so long as she had anything in her name, she had a right to leave it to anyone she wanted to. Is that the substance of it, and had she talked like that at any time before?

"A. No. There was a time when she went to the hospital for her operation, at that time she was faithful to her promise, and she gave me back the property which she had in her name, but afterwards there was a change in her attitude, I don't know why.

"Q. Will you explain what you mean about giving back the property? You mean the real estate?

"A. The real estate, yes sir.

"THE COURT: All right.

"Q. (Mr. Cohen): Mr. Malinow, did you have any other conversation with Glika along the lines you have just testified to, other than this one time?

"A. Oh, several times after the will was made, I kept on talking to her, when I see she doesn't feel very bad, so I thought we talk it over, bring the subject up again, that she is doing wrong, and sometimes she says, 'Don't bother me, don't you see I am suffering? Why you discuss with me about money? I am suffering, leave me alone.' "

Appellant admitted that he had taken the will to the office of Mr. Alpert to have the changes requested by decedent made, but denied any discussion as to his receiving the income from the estate for life.

Appellant's daughter testified that she had a conversation with decedent two days before the latter's death at which time decedent told her that she had done wrong and asked the witness to destroy the will. However, the following day this witness testified, in response to inquiries made by the court, that she had never discussed the will with decedent and that she knew nothing about the will until after decedent's death.

It can thus be seen that there is ample evidence to support the findings of the trial court to the effect that appellant not only acquiesced in decedent's asserted right to bequeath the property in question, but that he also actively aided her in the making of the will, thereby waiving his rights to claim the trust res as his own. Appellant's testimony to the contrary simply created a conflict in the evidence which the trial court determined adversely to him; and it is well settled, of course, that this court must uphold the findings of the trial court if there is any substantial evidence in the record to support

652

them. (*Andrews* v. *Reidy,* 131 Cal. App. 334, 336 [21 P. (2d) 457]; *Coulter Dry Goods Co.* v. *Munford,* 38 Cal. App. 231 [175 Pac. 900].)

■ In its findings the trial court cited and apparently relied upon section 2230 of the Civil Code of this state, which provides that a trustee may not take part in any transaction concerning the trust in which he has an interest adverse to his beneficiary, except: "When the beneficiary, having capacity to contract, with a full knowledge of the motives of the trustee, and of all other facts concerning the transaction which might affect his own decision, and without the use of any influence on the part of the trustee, permits him to do so." Although appellant challenges the applicability of this section of the code to the case at bar, we believe that it does apply here. As has been seen, appellant acquiesced and actively aided decedent in her claims adverse to his interest and it is clear that he did so with full knowledge of all the facts which might affect his decision. (See *Crenshaw* v. *Roy C. Seeley Co.,* 129 Cal. App. 627, 632 [19 P. (2d) 50].) ■ Moreover, it is well settled that where a beneficiary has consented to a course of conduct by the trustee, a rule permitting the cestui to attack the transaction later on would, as the court said in *Colton* v. *Stanford,* 82 Cal. 351, 378 [23 Pac. 16], "convert a rule intended to prevent fraud into one creating an incentive to and a cover of fraud." (And see Bogert, Trusts and Trustees, vol. IV, sec. 941; *Walker* v. *Doak,* 210 Cal. 30, 34 [290 Pac. 290]; *Miller* v. *Security-First Nat. Bank of L. A.,* 219 Cal. 120, 129 [25 P. (2d) 420].)

■ Although a presumption of fraud and undue influence arises in any transaction in a trust relationship by which a trustee gains an advantage, it is a rebuttable presumption. Whether respondent met the burden and overcame the presumption was for the determination of the trial court. (*Schurman* v. *Look,* 63 Cal. App. 347, 355 [218 Pac. 624].)

■ Moreover, even if the doctrine of acquiescence declared by Civil Code section 2230 has no application, the evidence as above recounted clearly sustains the implied finding that plaintiff, at the time the will was executed, made a gift of the property to Glika Goldman, and that the trusts then existing were then terminated. His activities in connection with the execution of the will can be explained only on that theory. If this theory is sound, and we think it is, then Glika Goldman, of course, has testamentary power over the property.

■ Neither the will of the decedent nor the inventory of her

estate was offered in evidence, but testimony relating to the same subject matter was introduced over objection of appellant's attorneys, and it is contended that the trial court committed prejudicial error in receiving this evidence. We are satisfied that appellant was not prejudiced, as claimed, for it is apparent that reference to the will was made during the trial because it was a link in the chain of circumstances showing that appellant acquiesced in decedent's adverse claims and the will also figured in conversations bearing on the question of acquiescence on the part of appellant.

Appellant also contends that since no special defense was pleaded, no special issues were raised by the pleadings and, therefore, the question of appellant's acquiescence was not an issue in the case and the findings in this respect were outside of the issues raised by the pleadings. This question was not raised during the trial, although evidence on that issue was introduced and it was treated as an issue in the case. The question cannot now, on appeal, be raised for the first time. (*Lawrence* v. *Ducommun,* 14 Cal. App. (2d) 396, 399 [58 P. (2d) 407] ; *Dunphy* v. *Guaranty Bldg. etc. Assn.,* 11 Cal. App. (2d) 419, 422 [53 P. (2d) 1036].)

We find no error in the record and, therefore, the judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 29, 1942.